THE BELLEFONTAINE RAILWAY COMPANY *v.* HUNTER, Administrator.

VERDICT.—*Special Findings of Jury.*—When the special findings of a jury upon particular questions of fact are used to control the general verdict, all the facts to authorize an adverse conclusion should appear by such special answers.

EVIDENCE.—*Declaration of Agent or Servant.*—In an action against a railroad company by an administrator, to recover damages for the death of his decedent occasioned by the collision of a locomotive and train of cars and a wagon in which said decedent was crossing the track of the defendant upon a public highway;

*Held,* that the declarations of a fireman employed on the locomotive at the time of the collision, made upon the arrival of said train, bearing the body of the deceased, at a station one mile from the place of the accident, the train having been stopped at the scene of the accident, and the body having been placed upon it and carried thereon to said station, that the train was running between forty and sixty miles an hour; that he could not tell any difference between the signal and the collision; that the deceased was sitting with his back toward the train; that he did not think the deceased saw or heard the train or knew there was any train in reach of him; that the deceased never moved out of his position till he was struck; that there was no signal, were not admissible in evidence as part of the *res gestœ.*

SAME.—*Presumption as to Improper Evidence.*—Where error has occurred in the admission of improper evidence material to the issue, it will be presumed that it worked injury, unless the contrary affirmatively appear; and the action of the court in overruling a motion for a new trial assigning such error for cause is not presumptive evidence that the error worked no injury.

NEGLIGENCE.—*Railroad.*—No neglect of duty on the part of a railroad company will excuse any person approaching on a highway a crossing of the track of said company from using the senses of sight and hearing, where these may be available; and injury to such person where the use of either of such faculties would have given sufficient warning to enable him to avoid the danger, conclusively proves negligence, and there can be no recovery for such injury, unless the railroad company has been guilty of such conduct as to imply an intent or willingness to cause the injury; and this can be attributed only where the company has notice of the particular emergency in time to avoid the collision by the use of ordinary diligence, the means being at hand. If the injured person had such warnings and opportunities of knowledge as would, with ordinary caution in such circumstances, have saved him from the danger, he will be held to have knowingly contributed to his own injury. The failure of a railroad train to give any signal when nearing a public crossing is not of itself negligence, in this State, unless the peculiar circumstances, the concealment of the train or the like, may render it necessary and proper.

APPEAL from the Marion Common Pleas.

RAY, C. J.—This was a complaint, in two paragraphs, against the appellant, charging in the first, that said corporation carelessly and negligently ran its locomotive and cars over one William M. Hunter, whereby he was instantly

killed, without fault or negligence on his part. In the second paragraph it was alleged, in addition to the former averments, that the appellant did recklessly, wantonly, and with gross carelessness, run the cars against, upon, and over the said Hunter, while he was in the lawful act, without fault or negligence, of crossing over said defendant's road, along and upon a public highway, leading over and across said appellant's road; that said appellant did not ring the bell, or blow the whistle, or give any signal of approach, whereby said Hunter might have been warned and informed of the near and rapid approach of said train, and his life thereby saved.

The answer was in denial. Trial by jury, and finding for the appellee, for thirty-five hundred dollars; and with the general verdict certain interrogatories were submitted and answered, as follows: On behalf of the appellee it was asked,

"1. Was not William H. Hunter killed on the afternoon of August 30th, 1867, by being run against by a locomotive and train of cars of defendant, at the point where the county road, leading north and south, crosses the track of the defendant's railroad at Minnowa Station, and while he, said Hunter, was crossing said railroad track along said county road with a wagon and team of horses which he was driving at the time?" Ans. " Yes."

"2. Did defendant's agents, running and having charge of said train of cars, give any signal of the approach of said train to said crossing of said county road?" Ans. "No."

"3. Was not said train running at a great speed when it approached the point where said county road crosses the railroad track of the defendant?" Ans. " Yes."

"5. Was not the rate of speed at which said locomotive and train were running, at the time it was approaching said crossing, from forty to sixty miles an hour? If not, what was the rate of speed? Ans. "No. From thirty to forty miles an hour."

Vol. XXXIII.—22

"6. Was the rate of speed at which said locomotive and train were being run when approaching said crossing slackened before reaching the crossing?" Ans. "No."

"7. Was the bell or whistle of the engine of said train rung or blown before said Hunter was struck by the said train?" Ans. "No."

"8. Did not the sound of the whistle and that of the crash of the collision of the train and wagon in which said Hunter was occur at the same time?" Ans. "Yes."

"9. Was not said county road, crossing said railroad track of the defendant, much used for travel?" Ans. "Yes."

"11. Did not the death of William H. Hunter result from the unreasonable rate of speed with which said train of cars approached the crossing of the county road and the railroad track over which he was passing, and from the failure of the engineer of the train to keep the proper look-out ahead of the train, and his failure to seasonably give notice of the approach of the train to the crossing, by the signal of blowing the whistle and ringing the bell?" Ans. "Yes."

And the jury returned the following answers to the interrogatories propounded by the court at the instance of the appellant:

"1. Did not William Hunter know, when he left Lanesville, on the 30th of August, 1867, that the train of cars would be due at that place in a few minutes?" Ans. "Yes."

"2. Could not the noise of the approaching train be distinctly heard on the road leading from the gravel road to Minnowa crossing?" Ans. "Yes."

"3. Could not the approaching train have been plainly seen by a person on the highway at a point thirty feet south of the railroad track?" Ans. "Yes."

"4. Was not Hunter in the full possession of the senses of sight and hearing?" Ans. "Yes."

"5. Did not Hunter, after he was notified of the approach of the train by Freeman, and when he knew the train was

due, and when he could have both seen and heard the train, take the risk of crossing in front of the train?" Ans. "No."

"6. Was the train going, before the collision, at a more rapid rate than thirty miles an hour, or forty-four feet per second?" Ans. "Yes."

"7. When Hunter was thirty feet from the middle of the railroad track, was the locomotive further than three hundred and fifty-two feet from the same point?" Ans. "Yes."

"8. Was it possible, in the exercise of ordinary prudence, to stop the train when going at the rate of thirty miles an hour, in the distance of three hundred and fifty-two feet?" Ans. "No."

"9. Was not Hunter's death caused in part by his own negligence and imprudence in attempting to cross the track in front of the approaching train?" Ans. "No."

And thereupon the appellant moved the court to render judgment for the defendant upon the special findings of the jury and their answers to the interrogatories propounded to them, notwithstanding the general verdict, because said answers and findings show,

1. That Hunter's negligence contributed to the injury that caused his death, and that he did not exercise ordinary diligence in crossing the railroad before and in full view and hearing of an approaching train, when he knew the train was approaching.

2. And the defendant was not guilty of such gross negligence as showed a willingness to inflict the injury or a disregard of consequences.

This motion was overruled by the court, and this action is assigned for error.

In case where the special findings of a jury are successfully used to control their general verdict, it is required that all the facts to authorize an adverse conclusion should appear by such special answers. Thus, although it appears that Hunter had notice of the nearness of the time when the train would be due when he was at Lanesville; that the noise of the approaching cars could be distinctly heard on

the road leading from the gravel road to Minnowa crossing; that such train was visible to a person on the highway thirty feet south of the railroad crossing; and that Hunter had full possession of the senses of sight and hearing; yet the finding does not place Hunter where the noise could be heard or the train seen. The action of the court was therefore correct.

The proof, however, supplies all these omissions.

By agreement of parties, a map, of which the following is a copy, was put in evidence as a correct representation of the place of the collision:

About one mile north-east from Lanesville, in Marion county, at a point called Minnowa Crossing, a county road running north and south on the section line, crosses the

railroad. The railroad runs straight, in a north-easterly direction, from Lanesville to a long distance beyond Minnowa Crossing. There is a platform at the crossing, where trains sometimes stopped, but express trains did not stop there. East of the crossing there was timber on both sides of the railroad, but the timber did not grow as close to the road on the south side as on the north side. A person traveling on the county road from the south, toward the railroad, when within fifty yards of the railroad, could plainly see a train approaching from the north-east for one hundred and fifty yards. There was no obstruction to the view.

Wm. Records, one of appellee's witnesses, testified, that a man driving a team fifty yards south of and towards the railroad could see the approaching train for a quarter of a mile.

To a person approaching the railroad on the county road, when within thirty feet of the railroad, the approaching train was plainly visible, without obstruction, for a mile. Upon this point there was no conflicting evidence.

The road from Lanesville to Minnowa Crossing, as shown on the accompanying map, is not further than a quarter of a mile from the railroad; and the cars can be easily and plainly seen and heard by persons traveling on said road.

According to the evidence of the conductor, the engineer, and the fireman on the train, and one of the appellee's witnesses, the train approached the crossing at about the rate of twenty-five miles an hour; by other witnesses it was placed beyond this speed; by the finding of the jury, at from thirty to forty miles an hour.

Witnesses, some at the time at a distance of more than a mile from the collision, heard the noise of the approaching train some minutes before the collision.

Andrew Ward, the first witness introduced by appellee, who was driving a wagon a quarter of a mile from the crossing, heard the cars coming very plainly three or four minutes before the collision. See 1 on map.

The next witness, Louisa Stiers, a little girl, a quarter of a mile distant, reading a paper, heard the coming train for "some time;" and the noise was so loud that it caused her to get up from her seat and look over that way before there was any collision. See 2 on map.

Hattie Stiers, a sister, also introduced by appellee, while eating supper on the north porch of the same house, heard the train coming "a few moments" before the collision. See 2 on map.

Jane Stiers heard the coming train before the collision, and spoke of the fact that it was coming fast, while eating supper on the same north porch. See 2 on map.

Zaccheus White, a witness introduced by appellee, was traveling from his house to Lanesville, on a road parallel with the one on which Hunter was traveling, about a mile west of the crossing, and "heard the train some time before it whistled. I heard it before I left my house." See 3 on map.

Elijah D. Wilmington, who was at Mr. Smart's, where Hunter lived, "a quarter or a half a mile" from the crossing, and was engaged at the time pulling roasting ears in the field, heard the cars coming before the collision.

Joseph Landis, merchant and express agent at Lanesville, distinctly heard, at the distance of a mile, the noise of the coming train a minute or a half a minute before the collision. See 4 on map.

I. N. Reddick, unloading gravel on the same road that Hunter traveled, half a mile from the crossing, heard the noise of the approaching train before the collision. See 5 on map.

William H. Hunter was twenty-two or twenty-three years of age, and in the full possession of the senses of sight and hearing. His mother's residence, where he had long lived, was close by the railroad station at Lanesville. He had been employed as a brakesman on the road a few months before the collision. At the time of the collision, he was living with Mr. Smart, three-quarters of a mile from

the crossing, within hearing of the passing trains. Mr. Smart was asked the question, "Do you know whether Hunter knew what times the regular train passed that point or not?" He answered, "Yes, he kept his watch with it. I believe he had his watch with him that day." Hunter was in the habit of passing this crossing with Smart's wagon. That day he had gone to Lanesville. Before he left Lanesville he was in a store where the post office was kept. The postmaster had made up the mail, and laid the mail bag on the counter near Hunter, and mentioned the fact to him that the train was about due, and then went to the door to look for the train, in the presence of Hunter.

N. B. Freeman testifies, "He was there five or ten minutes before the train was due. We were talking something about the train. I had the mail already made up. It was the mail train. We were waiting for this train. The mail bag was lying on the counter. Hunter was standing by the counter getting his tobacco. There was something said about the train, but I could not tell what it was now. I was looking for the train, and something passed about its being perhaps five or eight minutes till train time. I know we were talking about the train being due or about due. I went to the door once, I know, to look for the train, while he was in the store. He bought some smoking tobacco, lit his pipe, and went out of the store to his wagon. He had a wood wagon, I think, and two horses. He drove up towards the pike, the road that leads to the crossing, about as fast as his horses could go in a trot, a fast trot. He did not go out of a trot, but seemed to be in a hurry."

On cross examination, he was asked:

Q. "Did you notice the train as it came to the crossing at Minnowa?"

A. "I heard the train before it got there."

Q. "Did you hear the crash?"

A. "Yes, and three distinct blasts of the whistle."

J. N. Reddick testified, "On the 30th day of August, 1867, I was drawing gravel on the gravel road that runs through

Lanesville. I met Mr. Hunter a little more than a quarter of a mile from the crossing, on the gravel road. It is about a quarter of a mile from Minnowa Crossing to where the county road intersects the gravel road. I met Hunter about one hundred and fifty yards from the intersection. I spoke "good evening" to him, and he to me. He was sitting on the right side rail of the wagon—it was a wood bed—with his arm around one of the stakes. He was smoking his pipe. He had his back to the east, and the lines in his left hand. He was driving not very fast, in a moderate trot. I came on west toward Lanesville. I heard the train come along when I stopped to unload gravel, about a quarter of a mile from where the county road intersects the gravel road, I suppose about a half a mile from Minnowa Crossing. I heard the train approaching there. I heard the collision at that time. I do not know that I can tell you how long I heard the noise of the approaching train before the collision; it was a few minutes. Loading and unloading gravel makes a good deal of fuss. I heard the noise of the train coming. The wind was blowing from the north. There was a pretty cool air moving. I turned myself around to see what had happened, but could not see what was the matter. They whistled several times, to put down the brakes, I suppose. I drove back to the crossing and saw a good many men, none of them neighbors. I met the conductor fifty steps south of the railroad, coming to see if I could recognize the man."

Charles Andrew Crane testified, " I was fireman. At the time, I was on the running-board on the left hand of the engine, wiping the engine off. We were about on time, and traveling at about twenty-five miles an hour, about our usual rate of speed. My back was toward the way he was coming, and the first I noticed of him or the wagon was when the whistle blew. The moment I turned and looked that way, I saw the man and the fragments of the wagon going off to the left hand side of the engine, the south side of the railroad track. The horses ran off down the

track. After we stopped and backed the train up, I saw them down the road apiece, and did not suppose from appearances they were injured very badly."

Peter Crane testified, "I was engineer on the train.. My son, Charles Crane, was fireman. Frederick Crane, my son, then in his twelfth year, was also along with me. He rang the bell most of the way from Union City to Indianapolis. At the time, I was sitting on the right hand side of the engine, looking through the window or door, I don't know which. I know I was looking out ahead. I presume the door was open, as it was warm weather. There was a glass in the widow. I could see both sides of the track thirty feet ahead of the train."

Q. "Then if you had been looking out ahead at this time, could you not have seen any thing that came upon the track on either side of the road?"

A. "Not any way close to the engine. You would not see the opposite side much nearer than that. When I was very near the crossing, some twenty or thirty rods from it, I motioned to my little boy, who was sitting on the left hand side of the cab, to ring the bell, and I suppose he did it. I probably passed a little beyond the point where I usually rang the bell, or where it was usually rung, before he rang the bell.· The first intimation I had of the fact that the wagon was coming, was when my little boy told me there was a team coming on the track. I pulled the whistle instantly, before I saw the horses' heads. Looking out on the north side, I saw the wagon pole and the heads of the horses cross the track just an instant before the collision. I did not see anything else connected with the collision at that time. I did not see Hunter at all, till I saw him on the platform, after he had been struck. I could not say how long it was from the time I pulled the whistle till the collision; the time was very short. The train ran six hundred feet, or such a matter, before it came to a dead halt. I judge it was stopped about as quick as it could be stopped. I reversed the engine. I do not think I got the engine en-

tirely reversed till I got past the crossing. I had the reversal part way back when I was on the crossing. If I had seen the person approaching the track from the left hand side, I could not have stopped the train in time to prevent the collision. I had been engineer on that train for two years. I have followed the business for twenty-one years. The train was on time—not more than a couple of minutes behind anyhow—and was traveling at the rate of from twenty to twenty-five miles an hour."

Samuel Gochenaur, the conductor, testified that the train was on time and making the customary rate of speed, from twenty-five to thirty miles an hour.

Q. "What was the first you knew of the fact that there was anything in the way at Minnowa crossing?"

A. "A signal whistle. I was in the rear car, and when I heard the whistle I stepped on the back platform and looked ahead on the north side of the train, and saw a couple of horses going against the fence. About the time they struck the fence the rear end of the train was on the crossing. When the train stopped I got off and walked forward to the engine, and asked the engineer what was the matter. I then went around to the other side of the train, and saw the brakeman picking up the man in the ditch behind the train. They took him down to the platform, and I walked down there as quick as I could and found him nearly dead. Then I signaled the engineer to back the train, in order to get the man into the baggage car, and by that time some gentleman came along the road driving a team from the south, and I beckoned him to come up. I understand his name is Reddick. I did not see any person else that lived in that neighborhood. The train went about three times its length past the crossing before it stopped. Its length was about two hundred and twenty-five feet. A train going at the rate of twenty-five miles an hour will run three or four train lengths in being stopped."

Error is assigned upon the admission, over the objection of the appellant, of certain evidence offered by the appellee.

The appellee introduced Zaccheus White, and asked him:

Q. "Were you at Lanesville station when the train came down there?" Ans. "Yes."

Q. "State what you did when you got to Lanesville."

A. "I was standing right by the engine when the train stopped."

Q. "Did you see the body of Mr. Hunter when it was taken off the train?"

A. "Yes; I helped to take charge of it."

Q. "If you had any conversation at that time with the fireman of that train as to the rate of speed at which the train was running when it came to Minnowa Crossing, state what that conversation was."

The defendant objected for the reasons following:

"We do not admit that a railroad company can be bound by any admissions or statements of any agent, unless such admissions or statements were made within the scope of his authority. The plaintiff here proposes to prove what was said by some employee of the company, not at the time of the collision, but afterwards; not at the place of the collision, but at a different place, the next station on the road. The conversation cannot be let in under the rule in regard to *res gestæ*; that rule cannot be applied to a thing of this sort. The fact that the dead body of Hunter was on the train, still in the hands of the company, does not alter the case. If that circumstance were allowed to justify the admission of these statements in this case, then upon the same principle, if the company had brought the body from New Orleans to Indianapolis, any fireman on the train could bind the company by his statements at the latter place. Furthermore, we insist that if a *tort* has been committed, the admission or statement of an agent, after the commission of the *tort*, can never be competent to bind the principal. This fireman was acting within the scope of his authority in running the engine, but not in making the statements, if he made any, which the plaintiff seeks to introduce."

The objection was overruled by the court, and the defendant excepted.

The witness then answered, "He said the train was running over forty miles an hour, between forty and sixty miles an hour, somewheres. He said he could not tell any difference at all between the signal and the collision of the engine with the wagon; that the man was sitting with his back toward the train; and that he did not think the man saw or heard the train, or knew there was any train in reach of him. He said he never moved out of his position till he was struck. He said there was no signal at all."

The appellant asked the court to give the following instructions, which the court refused to do, and the appellant excepted:

" 5. The accident in this case took place at the intersection of the railroad track and a public highway, and it is the duty of a traveler approaching a railroad crossing to look along the line of the track, if possible, and see if any train is coming; and if you find, from the evidence, that the deceased failed to take such precautions before the happening of the accident, then he was guilty of negligence, and you will find for the defendant.

" 6. A traveler approaching a railroad crossing on the public highway is bound to exercise ordinary care, and vigilance, and foresight, in proportion to the danger to be avoided and the fatal consequences involved in his neglect. His vigilance should be quickened, not slackened, by the fact that he could not see the track sideways to any distance till he got on the track. And if the decedent could not see an approaching train by reason of any obstruction to the view, then he was called to greater care and watchfulness in driving upon the track than if the view had been open. *And if he heard, or in the exercise of ordinary care and watchfulness might have heard, the noise of the coming train, and then drove upon the track, without first fully ascertaining that there was no danger from collision, he was guilty of negligence, and you will find for the defendant.*"

This instruction was given after striking out the part printed in italics, to which appellant excepted.

"7. It is not enough to entitle the plaintiff to recover in this action, that he established the fact that the defendant neither rang the bell nor sounded the whistle. If you find these facts proved by a preponderance of testimony, then it must further appear to your satifaction that the accident was brought about by reason of this omission. And if the decedent had notice in any other way, of the approach of the train, either from a knowledge of the train time, or by notice given that the train was coming, or by the noise of the running train, that it was approaching, and with this knowledge heedlessly *and recklessly* drove upon the track without first apprising himself that he could cross in perfect safety to himself and the defendant, then the plaintiff cannot recover, and you will find for the defendant."

This instruction was given after the words "and recklessly" had been inserted by the court, over the objection of appellant.

"12. If the jury believe, from the evidence, that the collision resulted from the fault or negligence of both parties, and Hunter's fault was upon a point which he knew, or had reason to believe, would or might contribute to the injury, then the plaintiff cannot recover.

"13. If Hunter was guilty of negligence, or did not use ordinary care to avoid the injury, the plaintiff cannot recover in this case, unless the defendant has been guilty of such gross negligence as to imply a disregard of consequences or a willingness to inflict the injury, and from the consequences of which Hunter could not escape by reasonable diligence."

The court gave the following instructions:

"1. This action is brought by George W. Hunter, as administrator of Wm. H. Hunter, deceased, against the Bellefontaine Railway Company, to recover damages alleged in the first paragraph of the complaint to have been sus-

tained by reason of the defendant, by her officers, agents, employees, and servants having carelessly and negligently run the locomotive and cars of the defendant upon and over William H. Hunter, thereby causing his death, the said William H. Hunter being then and there without fault in the premises.

"2. In a second paragraph of the complaint it is alleged that the defendant's agents, officers, employees, and servants recklessly, wantonly, and with gross carelessness and negligence, ran the locomotive and cars of the defendant over and upon Wm. H. Hunter, thereby causing his death, Wm. H. Hunter being then and there without fault or negligence in the premises.

"3. The defendant denies the matters set out in the complaint; and to entitle the plaintiff to recover, the material matters alleged in the complaint must be sustained by a preponderance of evidence.

"4. The plaintiff cannot recover in this action unless Wm. H. Hunter could have maintained an action for injuries received by the same acts of the defendant's agents or employees, had he lived.

"5. The right of the plaintiff to recover rests upon the facts assumed in the two paragraphs of the complaint—in the first, that the defendant, by her agents and employees, caused the death of Wm. H. Hunter by their carelessness and negligence in running the locomotive and cars of the defendant, and that there was no negligence or want of ordinary care on the part of the deceased, contributing, in any degree, to his death.

"6. To entitle the plaintiff to recover under the first paragraph, you must therefore find that the agents or employees of the defendant were negligent and careless in running the locomotive and cars, thereby causing the death of Hunter, and that Hunter was free from any negligence in any degree contributing to his own death.

"7. In the second paragraph it is charged that the defendant, by her agents and employees, caused the death of

Hunter, by recklessly, wantonly, and with gross carelessness and negligence running the locomotive or cars upon or against him, he being without fault or negligence.

"8. Under this paragraph, if you find, from the evidence, that the agents or employees of the defendant in charge of the locomotive and cars, recklessly and wantonly, and with gross carelessness and negligence, ran the same upon or against William H. Hunter, thereby causing his death, the plaintiff will be entitled to recover, though the deceased may not have used ordinary care to avoid the injury, unless his failure to use ordinary care was upon a point his own negligence of which resulted in his death.

"9. The injury causing the death of Hunter occurred at a place where a public highway crossed the railroad of the defendant, where each had a legal right to pass; and the rights and duties of a railroad company in running their cars and of persons traveling on a public highway crossing the track of a railway are mutual; each has the right to pass, and each is bound to use ordinary care and diligence, in doing so, to avoid injury to the other. Travelers upon the highway and the agents or employees of a railway company may each act upon the presumption that the other in their conduct will act in accordance with the legal rights and duties of both.

"10. In this connection, it is perhaps well to define some of the terms which have been much used in the argument of the cause and in these instructions. By the term 'ordinary care' is meant that degree of care which persons of common and ordinary prudence usually exercise in their own affairs. This degree of care must, however, vary according to the circumstances. It must be proportionate to the dangerous character of the business and of the mode and means of conducting it; and the degree of vigilance which the law exacts in requiring the exercise of ordinary care varies with the probable consequences of negligence, and also with the command of means to avoid injury to others possessed by the person on whom the obligation is

imposed. Or, as applied to both the plaintiff and defendant in this case, it is such a degree of care, skill, and diligence as men of ordinary prudence under similar circumstances usually employ.

"11. Gross negligence is sometimes defined to be 'the absence of slight care, or that degree of care which every man of common sense, though very absent and inattentive, applies to his own affairs.' As applied in this case, to charge the defendant by her agents and employees with having recklessly, wantonly, and with gross carelessness and negligence, caused the death of Wm. H. Hunter, as set out in the second paragraph of the complaint, it must appear from the evidence that the negligence of the agents and employees of defendant was so gross as to imply a disregard of consequences or a willingness to inflict the injury.

"12. The term recklessness, as applied to management of the train, is such gross negligence as is utterly regardless of consequences.

"13. It was the duty of those in charge of the train of the defendant, when approaching the crossing, to give some signal, by ringing the bell, sounding the whistle, or otherwise, calculated to call the attention of an ordinarily prudent man passing on the highway to the approach of the train, unless you believe the railroad track to have been in such public view, or the noise made by the running of the cars sufficient to enable an ordinarily prudent man, exercising usual care, to have notice of the approach of the train and avoid collision. And it was their duty also to exercise care in running the train at a reasonable rate of speed, such a rate of speed as would enable a prudent man exercising ordinary care to avoid collision; and when it becomes evident that contact is liable to occur, it is their duty to use all reasonable means to avoid it. In this action, you must determine from the evidence what means were proper to be used, under all the circumstances of the case, to avoid the collision.

"14. It was the duty of the deceased, in charge of the

horses and wagon, in approaching the crossing, to exercise such care as a person of ordinary prudence would, under similar circumstances, usually employ in looking out for the approach of the train and acting so as to avoid contact with it; and if you believe from the evidence that the exercise of such care would have prevented the accident, you will find for the defendant, unless you find that the collision resulted from such gross negligence and recklessnes on the part of those in charge of the train as to indicate an entire disregard of consequences or a willingness to inflict the injury.

"15. If the jury believe from the evidence that no signal was given, before approaching Minnowa Crossing, by the employees of the railroad company, and that the train was going at an extraordinary rate of speed, this did not justify Hunter in encountering the risk of crossing, if he saw or heard the approach of the engine or was otherwise satisfied of its presence in season to avoid the peril.

"16. A party who sees or hears an approaching engine, or is otherwise notified of its near approach, and chooses to take the risk of crossing before it rather than await its passage, forfeits all claim to redress.

"17. If, under the evidence and these instructions as to the law applicable in the case, you find the plaintiff will be entitled to recover, it will be your duty to determine the amount which in your judgment the plaintiff should receive. This will be such a sum as you deem a fair and just compensation, taking into consideration the circumstances surrounding the deceased, his family relations, &c., the amount to be determined by the exercise of a sound discretion; but in no event can it exceed the sum of five thousand dollars."

It is objected that the bill of exceptions does not state that it contains all the evidence given in the cause.

The bill of exceptions shows the impanelling of the jury and the introduction of evidence by the plaintiff; and it states at the close of the testimony of a large number of

witnesses, "and here the plaintiff rests, and evidence for the defendant is heard as follows." The evidence of witnesses for the defense is set out, concluding, "and here the defendant rests, and the plaintiff doth the like." But the plaintiff has introduced no rebutting evidence, and upon what then does he rest, except upon the evidence already stated? Indeed, while a reasonable strictness in pleading and practice aids in the due administration of justice, it is yet true that any illiberality in the application of the rule requiring it to affirmatively appear that a bill of exceptions contains all the evidence given in the case, can only defeat this purpose. We know that a judge trying a cause below does not sign a bill of exceptions in which any portion of the evidence is stated, unless he believes it to contain all the evidence given. The omission to state this fact in words does not aid in the correct decision of the case, if we therefore reject the evidence stated. For this reason, we did not continue in force a heretofore-existing rule which required the use of certain words at the conclusion of a bill of exceptions to indicate the completeness of the record. Any language which implies such a condition of the record is sufficient. But with this comment we conclude.. We do not determine whether the bill of exceptions is sufficient to enable us to examine the evidence upon the issue whether or not it sustains the finding. We will accept the fact that such evidence as is contained in the bill of exceptions was given; and while we will not rest our decision upon the instructions given, we will examine into the correctness of the rulings upon the admission of evidence, not however excluding ourselves from an examination of the instructions.

Upon the question of the admissibility of the reported statements of the fireman who was upon the engine at the time of the accident, it seems scarcely required that authorities should be cited. Such evidence was plainly improper. The appellant has cited us to *Luby* v. *The Hudson River R. R. Co.*, 17 N. Y. 131, where the precise question is decided.

This was an action for running a horse car over plaintiff

in the street. A policeman was permitted to prove, over defendant's objection, that after the accident he arrested the driver, and that as he was getting off the car, and out of the crowd which had surrounded it, he asked him why he did not stop the car, to which the driver replied, the brake was out of order. The court held: "The declarations of an agent or servant do not, in general, bind the principal. When his acts will bind, his statements and admissions respecting the subject matter of these acts will also bind the principal, if made at the same time, and so that they constitute a part of the *res gestæ.* To be admissible they must be in the nature of original, and not of hearsay evidence. They must constitute the fact to be proved, and not be mere admissions of some other fact. They must not only be made during the continuance of the agency, but in regard to a transaction pending at the very time. The declaration was no part of the driver's act for which the defendant was sued. It was not made at the time of the act, so as to give it quality and character. The alleged wrong was complete, and the driver, when he made the statement, was only endeavoring to account for what he had done." The case was reversed for the error of admitting this evidence. *Moore* v. *Meacham,* 10 N. Y. 207; *Lane* v. *Bryant,* 9 Gray, 245.

It is insisted that even if erroneously admitted, still the evidence is not shown to have influenced the jury, and therefore the error may have been harmless. It is plain, however, that the rate of speed at which the train was moving did, whether properly or not, form an important element in leading the jury to the conclusion that the death resulted from the negligence of the appellant. The admission of White fixes the rate at the highest stated by any witness, and the jury have adopted his minimum, although no other witness testified to even that speed. But where error has occurred in the admission of improper evidence, it must affirmatively appear that no injury was caused by such error; and the action of the court below in overruling the motion

for a new trial is not, as appellee insists, presumptive evidence of the fact. The court below, doubtless, having admitted the evidence, overruled the motion for a new trial upon the ground that no error had occurred. Nor is the opinion of the judge trying the cause below, if accessible to us, as to the particular evidence which influenced the action of the jury, entitled to special consideration. Where improper evidence, material to the issue, has been admitted, the presumption is that it worked injury; and no mere matter of opinion or speculation will justify us in affirming a judgment rendered upon a verdict thus obtained.

This decision involving a reversal of the case, we will, without further question as to the completeness of the bill of exceptions regarding the evidence, proceed to examine the correctness of the instructions given, as applied to the evidence before us, there being no question that the instructions are fully stated.

In *The Toledo and Wabash Railway Co.* v. *Goddard*, 25 Ind. 185, the doctrine was stated thus: "Where negligence is the issue, it must be a case of unmixed negligence, to justify a recovery; and if both parties, by their negligence, immediately contributed to produce the injury, neither can recover." The authorities then supporting the position were very fully stated. Later decisions have only confirmed the rule, which, indeed, rests upon the case of *Butterfield* v. *Forrester*, 11 East, 60, where Lord ELLENBOROUGH held, that "a party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he do not himself use common and ordinary caution to be in the right."

In *The Lafayette and Indianapolis R. R. Co.* v. *Huffman*, 28 Ind. 287, the negligence on the part of the plaintiff which will defeat his action is again stated and applied, even when an infant is the injured party. The court below had instructed that if the servants of the company had failed, in the management of the train, to use such diligence and care as prudent and discreet persons should use, &c., and

the plaintiff was injured, he was entitled to recover, unless from his own negligence or want of reasonable care he had brought the injury upon himself. The court say this is not the law. It is not necessary that the negligence of the plaintiff should have "brought the injury upon himself." If it directly contributed to that result, it would have defeated the action, where the defendant was only chargeable with want of ordinary prudence. The following instruction given by the court below, viz.: "Although the plaintiff was in fault, yet if the employees of the defendant might with reasonable diligence have avoided the injury, it was their duty to have done so; and their failure to do so would render the company liable," is thus disposed of: "That is not the law. Where the plaintiff is in fault, a want of reasonable diligence will not render the defendant liable."

In *The Indianapolis and Cincinnati R. R. Co.* v. *Rutherford*, 29 Ind. 82, the jury found specially, that the injury (a broken arm) would not have happened if the plaintiff had kept his arm inside the car. Yet the jury gave the plaintiff a verdict of seven hundred dollars against the railroad company. The latter appealed. The court say: "This judgment cannot stand. The place for the passenger is inside, not outside the coach. This is known to everybody who ever saw a railway car. Nothing is better settled than that in such a case, if the plaintiff's negligence has contributed to the injury he cannot recover."

In *Telfer, Adm'r,* v. *The Northern R. R. Co.,* 30 N. J. 188, where the action was for killing the plaintiff's son, who was crossing the track of the defendant on a public road, it was said, "In crossing ordinary roads, caution and care are chiefly demanded to avoid running against or over anybody else; in crossing railroads, it is exacted to avoid being run over yourself. In the former case, the blame attaches *prima facie* to the party doing the injury; in the latter, it attaches, in the first instance, to the party obstructing the track." The court say, "whether the whistle was blown or bell rung upon the approaching engine, is imma-

terial, if the boys knew, or with ordinary caution might have known, in time to avoid the collision, that the train was approaching. Although the engineer saw the boys approaching the crossing, while yet at such a distance as not to indicate their ignorance of the coming train, it was his right to suppose they did not mean to attempt to cross before the train; and if he acted upon that impression, it was not negligence or want of ordinary caution on his part, although the supposition proved to be groundless." It is said that the law does not require that the speed of a railway train should be lessened when crossing any other way, unless the track be concealed from view, or passing through some thronged street or highway. The railway is but a single track on which cars can run, and there is no limit to the speed except the safety of the train. All other conveyances are under more immediate control, and can turn to the right or left or stop and avoid injury. "All persons and things are perfectly safe from collisions except on this narrow track, and cannot be harmed unless they go upon the track; consequently, every person is under the strongest possible obligation not to venture upon that track when the cars are about to pass. If he do so and get hurt, it can scarcely be otherwise than that the risk and the fault are his own. Nor does it make any difference how strongly the party may believe or suppose that he can cross with safety. If he gets hurt, the miscalculation was his own, and the consequences must rest upon him. Nor does it at all change the case that the party did not think of the cars. He was bound to think of them, if he knew the road was there. Nor is it any excuse that he was in a covered wagon, and did not see, or did not see fit to look; for a person cannot close his eyes or cover himself up in the midst of danger and then plead that he could not see. It is not a trifling matter to stop a train of cars where it would not otherwise stop, when it is running on time and is required to pass another train at a given point, and when the failure to do so might produce serious consequences. I do not

think a conductor is bound to stop his train because he sees an individual standing on the track a quarter of a mile ahead of him; because he has every reason to suppose that he will leave the track before the cars reach him. Nor do I think he is bound to stop his train because he sees a vehicle slowly approaching the road, or quietly standing a few yards from it, with the horse's head towards it; for he has every reason to suppose that they will not attempt to cross until the train has passed."

If the engineer see a person on the track, to whom the train must be in full view, and there is nothing to indicate a want of consciousness or capacity, he would not be bound to stop his train. He would have the right to presume that the party would remove in time to avoid the danger. *The Philadelphia and Reading R. R. Co.* v. *Spearen,* 47 Penn. St. 300.

In *The North Pennsylvania R. R. Co.* v. *Heleman,* 49 Penn. St. 60, it is held to be the duty of the traveller approaching a railway crossing, to look along the line of the railroad track and see if any train is coming; and if he fail to take such precaution, it is more than evidence of negligence—it is negligence itself, and the court should so charge the jury.

This, indeed, is the true rule; for when it is determined as a legal proposition that one may not rush blindly upon the rails over which trains are passing propelled by an agent serving its master almost at its own will, the neglect of this duty to use the physical senses is negligence, and not mere evidence of negligence.

In *Dascomb* v. *The Buffalo and State Line R. R. Co.,* 27 Barb. 221, the facts were these: The plaintiff lived near and owned land on both sides of the New York Central R. R. At four o'clock, P. M., he was proceeding across the road, at what is called the Camp Road Crossing. The highway and the railway crossed nearly at right angles and at grade. The passenger train was then due. There is no evidence that those in the wagon looked for the train or took any precaution whatever. The result was that the wagon,

was struck, Dascomb's son killed, and he himself severely injured. The court say: "It should and must be regarded as very little short of recklessness, for any one to drive on the track of a railroad without first looking and listening whether a moving train is near. The negligence of the defendant in this case was a failure to ring the bill or sound the whistle. Yet, as Dascomb was also negligent, he could not recover. Those living near a railroad may, by contact, become careless; but they will be no less chargeable with negligence in case they rush on the track without looking and trying to ascertain first whether danger is near. Failing in this respect, they cannot be permitted to recover for injuries received. It is a well settled principle of the common law, that he whose negligence has contributed in any essential degree to the injury sustained cannot maintain an action against the party whose negligence has also contributed to the injury. When negligence is the issue, it must be a case of unmixed negligence. This rule is important, salutary in its effects, and should be maintained in its purity. The careless are thereby taught that if they sustain an injury to which their own negligence has contributed, the law will afford them no redress."

If a party rushes into danger, which by ordinary care and prudence he could have seen and avoided, no rule of law or justice can be invoked to compensate him for the injury he may have so received. *Chicago and Alton R. R. Co.* v. *Gretzner*, 46 Ill. 74.

In *Ernst* v. *Hudson River R. R. Co.*, 39 N. Y. 61, Judge CLERKE uses this language: "Any contributory negligence of a person attempting to cross a railroad track undoubtedly excuses the railroad company, whether the required signals are, or are not, given; or whether the company is or is not guilty of any other negligence." Judge CLERK further adds, "the rule of this court is not ignored or modified by any former opinion, that where the injured party has not used ordinary care, there can be no recovery against the company."

Judge WOODRUFF repudiates the idea that the railroad company was legally bound to keep a flagman at that station; or that the omission to do so was negligence *per se.* "There is no such rule of law; no statute requires it." Again, "It is not denied that if the intestate (Ernst) was guilty of negligence, contributing to the injury, the plaintiff was not entitled to recover." Again, "A traveler is bound to use his eyes and ears as far as there is opportunity." "Negligence in the railroad company to give the proper signals, or in omitting precautions of any kind, will not excuse his (the traveler's) omission to be diligent in such use of his own means of avoiding danger." "And when by such use of his senses the traveler might avoid danger, though the company neglect to give signals or warning, yet his omission (to be diligent) is concurring negligence, and should be so peremptorily declared by the court."

A leading case on the question at issue is *Wilcox, Adm'x, v. The Rome, &c. R. R. Co.,* 39 N. Y., 358.

In that case, the intestate was crossing the track on Court street in the village of Watertown. The track and the trains on it were in plain sight for a distance of eighty rods. The street and the track cross each other at right angles. A special train came to the crossing at the rate of about fifteen miles an hour, without ringing the bell or sounding the whistle as it approached the Court street crossing. There was no signal man stationed at the crossing. While the deceased was on the track near the Court street crossing, and twenty-five feet inside the east line of the street, he was struck and carried forty-five feet. He died of his injuries.

The court held, that "where deceased was killed in attempting to cross the railroad track within the limits of the public highway, and at a public crossing, if it appear that the deceased would have seen the approaching cars in time to have avoided them, had he first looked before he attempted to cross, it will be presumed he did not look; and by omitting so plain and important a duty, he will be

deemed to have been guilty of negligence which precludes a recovery."

In the *Galena and Chicago Union R. R. Co.* v. *Loomis*, 13 Ill. 548, the court held, "that if without signals, the injured party might, with care, have seen the train and known that it was approaching, he could not recover. A failure to ring the bell or sound the whistle does not raise a presumption that this was the cause of the injury." The omission of these signals is no more, and no less negligence, than the neglect of any other duty. It is neither gross negligence, nor culpable negligence, nor any other degree of negligence. It is simply and only negligence. *Chicago and Mississippi R. R. Co.* v. *Patchin*, 16 Ill. 198; *Galena and Chicago Union R. R. Co.* v. *Dill*, 22 Ill. 264; *Illinois Central R. R. Co.* v. *Phelps*, 29 Ill. 447.

In *Pennsylvania R. R. Co.* v. *Henderson*, 43 Penn. St. 449, it is held, that the injured party is charged with knowledge, or regarded as knowing, if he had such warnings and opportunities of knowledge as would, with ordinary caution in these circumstances, have saved him from the danger. This, we think, is a correct statement of the law, and under such circumstances the party must be held to have knowingly contributed to his own injury.

In *Beisiegel* v. *New York Central R. R. Co.*, 40 N. Y. 9, it was held, that the common law does not impose the duty of warning by signals persons crossing their track, and that if the injured party by looking up the track, in the direction of the approaching train, could have seen it in time to have avoided the injury, his omission to do so was negligence.

In *Havens* v. *The Erie Railway Co.* 41 N. Y. 296, it was declared, that where the statute required signals to be given by the company on approaching a railroad crossing, and they were omitted, yet such omission did not absolve the person approaching such crossing from looking up and down the track, to see whether a train was approaching; and his omission so to do precluded his recovery.

In *Baxter* v. *The Troy and Boston R. R. Co. Id.* 502, it is said, "The law requires care at all times when in a situation of danger, and mental absorption or revery, from business, grief, &c., will not excuse its omission. The inquiry is whether, from the evidence, it satisfactorily appears that the plaintiff, by looking, could have seen the train in time to have avoided the collision. · If so, the plaintiff should have been non-suited."

In *Stubley* v. *London and N. W. R. W. Co.*, L. R. 1 Ex. 13, defendant's track crossed a much traveled foot-way; on each side was a swing gate some distance from the rails; at the west gate, owing to the pier of a bridge, a person could not see a coming train for over thirty yards south, but by going within the line and within about nine feet of the track he could see three hundred yards each way. The deceased came from the west to cross, and was detained by a freight train passing south. As soon as it had passed she proceeded to cross behind the train, and just as she reached the east track was struck down by an express train from the south, which she had not observed.

POLLOCK, C. B., said, "The track is of itself a warning of danger to those about to go upon it and cautions them to see whether a train is coming. There was no evidence to go to the jury."

BRAMWELL, B., said, "Passengers crossing the rails are bound to exercise ordinary and reasonable care for their own safety, and to look this way and that way to see if danger is to be apprehended."

In *Butterfield* v. *The Western R. R. Co.*, 10 Allen, 532, the "plaintiff was acquainted with the highway and railroad. If he had looked he would have seen the train. It came from the west, and for a half a mile west of the highway the track was in plain sight. It was a stormy night, raining, blowing hard from the north-west, and snowing some. He had his hand up holding his hat on his head and this prevented him from seeing the train. He was listening for the cars, his attention was called to the subject, and he ex-

pected to hear the bell or whistle, but there was no bell rung or whistle blown. Plaintiff's neglect to use his own eyes was palpaple negligence. The jury ought to have been instructed that he had offered no evidence of due care on his part, and was not entitled to a verdict."

In the case of *Cliff* v. *The Midland Railway Co.*, L. R. 5 Q. B. 258, Hilary Term, 1870, LUSH, J., uses this language: "I think that when the legislature authorizes a railway to cross a way, public or private, upon a level, and does not require from the company any precaution to avoid danger, the legislature intends that the persons who have to cross that line should take the risk incident to that state of things." It was held, accordingly, where the action was for negligence in knocking the plaintiff down and injuring him at a crossing of the railway, that it was error in the judge, in summing up, to leave to the jury as evidence of negligence in the railway company, the omission to keep a gate keeper.

We think the law may be regarded as fixed, that no neglect of duty on the part of a railroad company will excuse any one approaching such a crossing from using the senses of sight and hearing, where these may be available; and injury where the use of either of such faculties would have given sufficient warning to enable the party to avoid the danger, conclusively proves negligence, and there can be no recovery; unless the railroad company has been guilty of such conduct as will imply an intent or willingness to cause the injury; and this can only be attributed where the company has notice of the particular emergency, in time, by the use of ordinary diligence, the means being at hand, to avoid the collision.

In *The Indianapolis and Cincinnati R. R. Co.* v. *McClure*, 26 Ind. 370, where the action was for killing stock, a quotation is made from Redfield on Railways, an author whose language it were well always to carefully weigh, stating that this willingness to injure "is always to be attributed to the defendant, if he might have avoided injuring the plain-

tiff, notwithstanding his own negligence." The decision, however was in express contradiction of this rule; for it is admitted that the company in that case were guilty of carelessness in running their train at too great speed, and yet they were held not liable. The reporter inadvertently carried into the syllabus this erroneous statement of the law, the use of which was simply incidental and not material to the decision. Such a doctrine would require the exercise of the highest degree of diligence on the part of the defendant to protect the plaintiff from the consequences of his own negligence.

In the case before us, each party had a right of passage, limited by that maxim of equity, *sic utere tuo, ut alienum non lædas.* Upon each rested the obligation, in the exercise of this right, to use such reasonable degree of foresight, skill, capacity, and care, as would be consistent with a proper regard for the safety of all others exercising the same right and using the like precautions. We do not say that such care must be used by each as would prevent the possibility of injury to himself or another. There are inevitable accidents. But such care is required as would reasonably and under all ordinary circumstances avoid collision with one using like caution — such care as a prudent man in the exercise of his usual diligence will observe. It is true that prudent men are sometimes careless. When so, they must accept the consequences of their departure from their usual line of conduct, and the exception is not to mark the amount of care exacted by the law.

Of necessity, the special acts, the omission of which would on the one part constitute carelessness, may not be required from the other party. One approaching in a carriage, on the highway, the crossing of a railroad, over which express trains at a high rate of speed are frequently passing, may reasonably be required to assure himself, if he can, by the use of his organs of sight and hearing that no cars are in dangerous proximity. If the use of such means would give the information, he may properly be charged

with such knowledge.   If necessary to make such observa-
tion, he will be required to reduce the rate of speed at which
he is moving, or even to stop his conveyance; and where
regular trains are passing, he should take notice of the time
when they are due, if such information is reasonably acces-
sible.   On the other hand, the company are required to
keep a reasonable look out at public crossings and to give
such signals of their approach as are calculated to notify
the public, when without such signals, and in the exercise
of the proper care and caution by the public, their proxim-
ity would not otherwise be known.   Thus, if the track
were concealed from view, and the sound of the train from
high wind or any other cause was destroyed, it would de-
volve upon the company to use any other usual and proper
method to give notice to passengers upon the highway.
But an express train, having connections to make where
failure may involve the loss of many lives, cannot be required
to stop, or even materially reduce its speed, at every cross
road where their approach is in full view and the sound of
of the train apparent to persons upon the public way.

By statute in many states certain signals are required to
be given by a train when nearing any public crossing, and
therefore their neglect to comply with the law under such
circumstances is negligence; but no such special act is now
required in this State, and therefore its omission is not in
itself negligence, unless the peculiar circumstances, the con-
cealment of the train or the like, may render it necessary
and proper.

The fifth instruction asked by the appellant should, un-
der the evidence before us, have been given.   The objec-
tion that it did not hold the appellant liable for gross negli-
gence is of no force, for there is no evidence of any witness
from which such intent or willingness to inflict the injury
could be inferred.   The sixth instruction asked should also
have been given without modification.   It is objected that
the words "without first *fully* ascertaining that there was
no danger from collision" are too broad, and that the test

should be the conduct of a prudent man under the circumstances. But while negligence is, in general, a mixed issue of law and fact, yet it is equally true that when the fact which it is claimed constitutes negligence is found, its legal character and consequences become a matter of law. *The Toledo and Wabash R. R. Co.* v. *Goddard*, 25 Ind. 185 ; *Dascomb* v. *Buffalo and State Line R. R. Co.*, 27 Barb. 221 ; *Butterfield* v. *The Western R. R. Co.*, 10 Allen, 532. Thus, if the deceased was apprised of the approach of the train by the noise, and ventured upon the track from a miscalculation of his danger, the error was his, and the company are not answerable for that erroneous calculation.

The seventh instruction should not have been changed by the insertion of the words "and recklessly," there being no evidence to justify such language. It is not proper that a court should countenance a jury in an evasion of the law, by bringing all cases where the injured party has been guilty of contributing negligence within the exception. The most that can be said under the evidence, in any view, is, that no signal was given, and that the railroad train was running at a great rate of speed. But in *The Indianapolis and Cincinnati R. R. Co.* v. *McClure, supra*, excessive speed was held not to justify a finding of willfulness or willingness to inflict the injury.

The twelfth instruction asked informed the jury that if Hunter's negligence contributed to his injury, and he knew or had reason to believe such fault would or might do so, he cannot recover. If the injury "resulted from the fault or negligence of both parties," Hunter could not recover; and his knowledge that such would be the result certainly could not change the rule. It would seem from the argument of counsel that they construe the instruction to import, that if Hunter did an act which he knew or had reason to believe would or might contribute to his injury, there can be no recovery.

The thirteenth instruction we are not prepared to sustain. A willingness to inflict the injury would perhaps render the

company liable, although the injured party might have avoided the injury by reasonable diligence.    But the court gave this instruction in the eighth one given.    We do not regard either as properly applicable to the evidence.    So also of the eleventh and twelfth instructions given.

The thirteenth instruction might well have been more guarded.    It is not clear that the rate of speed of a train in "public view," approaching a road crossing at a distance from a city, is material in enabling a prudent man to avoid collision; for if you reduce the speed, the train being in open view, the traveler attempting to pass before the cars may by an error of judgment be injured, unless the train be so far under the control of the engineer that he can absolutely stop it before reaching the crossing, a requirement which would forbid rapid transportation, in effect.    A prudent man would permit a train in "public view" and very near to pass, before attempting to cross the iron path.

The fourteenth instruction assumed erroneously that there was proof of willingness to inflict the injury complained of.

The fifteenth instruction should have informed the jury that if Hunter by the exercise of ordinary care might have seen or heard the train approaching, he was not justified in encountering the risk of crossing before it.

Reversed, with costs; remanded for a new trial.

*J. T. Dye* and *A. C. Harris*, for appellant.

*J. Hanna*, *F. Knefler*, and *N. B. Taylor*, for appellee.