ELLEN BROWN, Adm'x, *vs*. MILWAUKEE & ST. PAUL RAIL-
WAY COMPANY.

August 26, 1875.

**Contributory Negligence—When a Bar to Recovery.**—As applicable to cases of
ordinary negligence, when the injury is not claimed to have been wilfully,
wantonly or intentionally inflicted, the rules laid down by this court in *Don-
aldson* v. *Milwaukee & St. Paul R. Co.*, 21 Minn. 293, "that to maintain the
action it must appear that the injury was occasioned by negligence on defend-
ant's part, and it must not appear that there was contributory negligence
on plaintiff's part," and that "it is proper for the court, when the uncon-
troverted facts of the case show contributory negligence on the part of the
plaintiff, to rule, as a matter of law, that he cannot recover," cited and
approved.

**Same—Failure to Use Available Means to Avoid Known Danger.**—A failure,
under ordinary circumstances, to make diligent use of the available means at
one's command to avoid a known and apprehended danger, where it is appar-
ent that such danger might have been avoided if such means had 'been so
used, is to be regarded as concurring negligence, and so declared by the court.

**Railroad-crossing—Duty of Traveller on Highway.**—A railroad-crossing over a
public highway, upon the same grade, is a place of danger, and is of itself a
warning to one about to go upon it to be careful and vigilant, to the extent
of his opportunity, in the use of his senses of sight and hearing, to discover
an approaching train in time to avoid it.

**Same—Presumption of Negligence.**—When the vision of the traveller is so unob-
structed along the track that he can easily discover an approaching train,
or the circumstances are such that his sense of hearing, if used, must apprise
him of the same fact in time to escape it, it will be presumed, under ordi-
nary circumstances, in case of collision, that he did not look or listen, or,
if so, that he heedlessly disregarded the knowledge thus obtained. In either
of these cases, as a general rule, no action can be maintained.

**Contributory Negligence Imputed to Plaintiff in this Case.**—Upon the uncontro-
verted facts in the present case, considered and stated by the court, *Held*,
that contributory negligence on the part of the deceased clearly appears,
and that the action cannot be maintained.

**Railroad Company need not Whistle for Crossing.**—In the absence of any
statutory provision upon the subject, no legal obligation rests upon a rail-
road corporation to blow its whistle in approaching a public crossing with
one of its trains.

Appeal by defendant from an order of the district court for
Dakota county, *Crosby*, J., presiding, refusing a new trial.

*Bigelow, Flandrau & Clark*, for appellant.

*Brisbin & Palmer*, for respondent.

CORNELL, J. The record contains all the testimony and proceedings, and the main question is whether, in view of the uncontroverted facts, such a case of unmixed negligence on the part of defendant is disclosed as will justify the verdict. Defendant is charged with having so carelessly and unskilfully operated one of its trains, in crossing a public highway, as to have propelled the same against the intestate, thereby inflicting injuries resulting in his death. There is no averment nor claim that the injuries were wantonly, wilfully or intentionally inflicted.

The rule applicable to cases of this character, which we deem to be sound, is thus laid down by this court in its opinion in the case of *Donaldson* v. *Milwaukee & St. Paul R. Co.*, 21 Minn. 293 : " When there is no evidence whatever that the injury suffered was wilfully, wantonly or intentionally inflicted, to maintain the action, then, it must appear that the injury was occasioned by negligence on defendant's part, and it must not appear that there was contributory negligence on plaintiff's part." The court further say : " The question of negligence is ordinarily for the jury ; but when there is no evidence that the injury was wilfully, wantonly or intentionally inflicted by the defendant, and the uncontroverted facts of the case show contributory negligence on the part of the plaintiff, it is proper for the court to rule, as a matter of law, that the plaintiff cannot recover."

The common law imposes upon every one in the full possession of his faculties, when approaching a known place of danger, the exercise of that degree of prudence, care and caution incumbent upon a person of ordinary reason and intelligence in like circumstances ; and inasmuch as it may well be presumed that the instinct of self-preservation common to all must naturally prompt an ordinarily careful and prudent man to avoid an apprehended danger by a diligent use of the available means at his command, it has become settled that a failure in this respect, under ordinary circum-

stances, when it is apparent that the danger might have been avoided if such means had been so used, is to be regarded as concurring negligence, and so declared by the court.

A railroad-crossing over a public highway, upon the same grade, is a place of danger, and is of itself a warning to one about to go upon it to be careful and vigilant, to the extent of his opportunity, in the use of his eyes and ears, to discover an approaching train in time to avoid it; and when the vision of the traveller is so unobstructed along the track that he can easily discover an approaching train, or the circumstances are such that his sense of hearing, if used, must apprise him of the same fact in time to escape it, it will be presumed, under ordinary circumstances, in case of collision, that he did not look or listen, or, if so, that he heedlessly disregarded the knowledge thus obtained. In either of these cases, as a general rule, no action can be maintained.   Wharton on Negligence, §§ 382, 383, 384, and notes and cases cited.

In the case under consideration the injuries which resulted in the death of the intestate, Brown, occurred in a collision with a freight train of defendant, at a public highway crossing, known as Ferguson's crossing, while attempting to cross the track in front of the train.   The accident happened on August 10, 1871, between 8 1-2 and 9 o'clock in the evening.   Deceased resided some two and one-half miles south from the crossing, and had for over fifteen years, and his step-son, Anderson, was living with him.   On that day they had been at work together in reaping at Ferguson's, a neighbor, some forty rods north from the crossing, and started for home in a lumber wagon.   The team belonged to Brown and the wagon to Anderson, though the latter, as he says, "drove the horses that night."   They were both perfectly familiar with the character of the crossing, the ground in its vicinity, and the highway and railroad leading to it, having frequently passed there before along the road they were then travelling.   The train in question was a regular

freight train, going south, and coming from the direction of Rosemount, a place distant north from the crossing from one to one and one-half miles. It was some ten minutes behind time that night, and hence was due at the crossing when they started from Ferguson's, a fact of which they were aware at the time. Eighty rods from the crossing, towards Rosemount, is a whistling post. From Rosemount to the crossing the railroad is straight, nearly an air line, and on a generally descending grade, with a cut between Ferguson's and the crossing of between three and four feet, and another, deeper, for a short distance above the whistling post, and about three-fourths of a mile from the crossing. Ferguson's house is distant in a direct line from the railroad track about fifteen rods, so that the distance between the highway and the track at that place is less than fifteen rods, and it becomes gradually less as the crossing is approached. From Ferguson's to the crossing, along the wagon-road, and between it and the railroad, was a fence about four feet high, made of rails a part of the way and of boards the rest. Between this and the railroad, for a portion of the way, there was a snow fence, running parallel with the track, and forty or fifty feet from it, made of boards, with intervening spaces varying from one to three inches in width, and of a height variously estimated by the witnesses from eight to fifteen feet. This fence intersected the highway fence at a point near the crossing. The distance from this point, *via* the highway, to the track is estimated by plaintiff's witnesses as follows: Mrs. Ferguson thinks it about forty feet, Anderson from fifty to sixty feet, and McCarthy eighty or ninety feet. One of defendant's witnesses, and the only one who measured it, says: "I paced the distance from the crossing to the point of the snow fence. It was thirty-one steps, about three feet to a step." From this point to Ferguson's the highway was generally level and on grade. From the same point to the track it was pretty

rough and stony, and descended from two and one-half to four feet through a cut of that depth, and the only obstruction to the view up the track from this portion of the highway was an open board fence of three, four or five boards, and about four feet high.

Some of the witnesses speak of the night as " quite dark," and others as " middling dark," while Anderson says he " could have seen the train perhaps eighty rods away." The speed of the train was from fifteen to twenty miles an hour. In driving from Ferguson's to the crossing, Anderson, the only witness testifying on the subject, says : " We drove down in a kind of a little trot, pretty steady.  *  *  * We started off at a moderate trot ; did not stop the wagon still before we were struck ; kind of stopped when we went to go down on the track ; got out of a trot into a walk."

The fact is clearly established by the testimony of every witness upon the subject, and uncontroverted by any thereof in the case, that, for the whole distance of at least eighty rods along the track from the crossing, a coming train is plainly visible, from any point in the public highway between the track and the end of the snow fence at the highway, to a person sitting in an ordinary lumber wagon. The same is true as to every part of the highway from Ferguson's to within two or three rods of such end of the snow fence, and as to these two or three rods it is stated that a train " right close by" the crossing " cannot be seen without looking through the fence." It also appears that the head-light to the engine, at an elevation above the rails of ten to twelve feet, was lighted at the time of the accident, and that the height of the smoke-stack was about sixteen feet ; that the light from the head-light was thrown out for from thirty to forty rods in front of the engine, and lighted up each side of the railroad to a distance of ten or fifteen rods. Assuming that the train traversed the last eighty rods before reaching the crossing at the highest rate of speed testified to, it must have occupied forty-five seconds in running it, and it is im-

possible to resist the conclusion that the head-light to the engine was plainly visible from any part of the highway along which deceased and Anderson were then travelling for the whole of this time, and during the last twenty seconds before the collision they must have been actually within the limits of the light thrown out from the locomotive.

In view of the only testimony in the case based upon any kind of measurement—that the distance from the end of the snow fence to the crossing was thirty-one paces, or ninety-three feet—and the character of the estimates given by the other witnesses, it cannot reasonably be assumed that such distance was less than sixty feet. During the whole of the time occupied by them in driving over this space the train was in full view, and the light thrown from its head-light actually covering them most, and probably all, the time. "The horses went down the hill" to the track, says Anderson, "at a moderate gait," and it does not appear that they were frightened, or in the least unmanageable. No circumstance appears tending to show any difficulty in stopping for the train to pass at any point on this sixty feet, nor at any point before that.

These clearly are circumstances requiring the application of the rule "that if a traveller, by looking along the road, could have seen an approaching train in time to escape, it will be presumed, in case of collision, that he did not look, or, looking, did not heed what he saw." Wharton on Negligence, § 382. The only testimony as to Brown's looking is Anderson's, who says that they were sitting on a board seat together, and "shortly after starting out, and before we got to the point of the hill, (at the point of the snow fence,) Brown got out his pipe to have a smoke, and got around with his back to me to light his pipe with a match, so as to prevent the wind from blowing out the match. Don't know whether he looked for a train or not; did not observe him do so." Anderson admits that he did not himself look for

the train after passing the corner of the snow fence, when it is clearly shown that he might and must have seen it, if he had looked, in time to have escaped the collision. The engineer testifies that ten or twelve rods before reaching the crossing he " saw the wagon coming down the slope of the highway, some fifty feet, and perhaps more, back from the track, and that he then called for brakes by whistling." The fact that he so whistled for brakes before the collision is also testified to by all the other witnesses giving testimony upon the subject, and some of them, ninety to one hundred rods away, distinctly heard it. This testimony is undisputed by anything in the case. It is clear, therefore, that the attention of Brown and Anderson must have been attracted by the whistle for brakes in season to have enabled them, by looking, to see the train and to avoid it, and that if they had looked they must have seen it. Why they did not is wholly unexcused and unexplained by anything suggested by the evidence.

The facts that " he just turned his head around and looked " when he first started from Ferguson's, that he " looked again when he got perhaps one-fourth of the way along, and did not see it," and " just turned his head around again before he got to the snow fence and a little ways from it," and " looked next just as they got to the corner of the snow fence," (the last two places being the most difficult for observation of any portion of the highway,) and that he " listened for the train as he went along," furnished no excuse under the circumstances for a neglect to make any observation after leaving the fence, and where the whole track came plainly in view for over eighty rods, as he well knew. The conduct of both parties in respect to the use of their eyes evinced a degree of negligence sufficient to defeat a recovery by either, even though it be admitted that defendant was guilty of negligence on its part.

The evidence in respect to the noise made by the train as it approached from Rosemount, and their ability to hear it

in time to avoid a collision, points strongly to the same conclusion. Mrs. Ferguson says: " It was a middling still night," and the " wind was not blowing very much," but " was blowing from south-east." Rice says : " It was one of those still, quiet nights, when you could have heard anything a long distance." Anderson speaks of it as " a little wind." Jones says: " One, if listening, could hear the train a long distance off," and he, and others with him, in a granary ninety to one hundred rods south from the crossing, actually had their attention attracted by the rumbling of the train before the whistle and the collision. This is all the plaintiff's testimony, while the conductor says there was " no wind to speak of." Upon these uncontroverted facts we are of the opinion that there was concurring negligence on the part of both Brown and Anderson, and that the verdict cannot be sustained. The fact that Anderson drove the team is of no importance, as it is manifest that Brown had as much right to control them, and was as fully responsible for their movements, as Anderson.

On the trial there was some conflict of evidence as to whether the whistle was blown at the whistling post— plaintiff's witnesses stating that they did not hear it, and defendant's servants, having the train in charge, swearing positively that it was blown. The court charged the jury that " the law imposed upon this railroad company the duty of sounding the whistle at the approach of trains to this crossing at the whistling post; and if their employés in charge of the train failed to perform that duty, then they were guilty of negligence." It is conceded that there was no statutory provision upon this matter applicable to the company, and certainly there is no common law legal obligation or duty of the character indicated resting upon any company. *Beisiegel* v. *N. Y. C. R. Co.*, 40 N. Y. 9; *Bellefontaine R. Co.* v. *Hunter*, 33 Ind. 335; *Locke* v. *First Div. St. P. & P. R. Co.*, 15 Minn. 350. The instruction in this respect was erroneous. The exceptions

taken fully apprised the court of each particular portion of the charge and legal proposition objected to, and pointed out the foregoing instruction as one of those parts.

In view of the disposition of the case upon the foregoing grounds, it is needless to consider the other questions raised upon the record.

A new trial must be granted, and the order appealed from reversed.