## The St. Louis and South-Eastern Railway Co. v. Mathias.

PLEADING.—*Negligence.*—In an action against a railroad company for negligently injuring the plaintiff, a general averment of negligence is sufficient, without stating the particular acts constituting such negligence.

EVIDENCE.—*Ordinance of City.*—*Negligence.*—In an action against a railroad company for an injury alleged to have been caused by negligence in running a train of cars in a city, an ordinance of the city regulating the running of trains in the city, their speed, the ringing of the bell, etc., and

the violation of the ordinance, may be shown in evidence as matter to be considered in deciding the question of negligence.

SAME.—*Immaterial Evidence.*—A judgment will not be reversed on account of the admission of immaterial evidence, unless it appears that the party objecting was injured in his rights by the admission.

PRACTICE.—*Argument of Counsel.*—It is peculiarly the province of a court before which a trial is had to regulate and control the arguments of counsel; and if in any case the Supreme Court would reverse a judgment for an error in the exercise of such authority, there must be a clear case of abuse of such discretion.

NEGLIGENCE.—*Contributory Negligence.*—In an action to recover for an injury alleged to have been caused by the negligence of the defendant, it is not enough that there should have been negligence on the part of the defendant, but there must have been the absence of contributory negligence on the part of the plaintiff.

SAME.—*Running Train of Cars in City.*—It is negligence to run a train of cars in a city with twice the rapidity allowed by a city ordinance, and without ringing the bell, sounding the whistle, or giving any signal of approach.

SAME.—It is also negligence to run such train, when, because of the coldness of the weather, all the employes on the train are upon the engine, and the only means used for checking or stopping the train are such as can be commanded and used by the engineer.

SAME.—*Duty of Person About to Cross Railroad Track.*—It is the duty of a person about to cross a railroad track to look in each direction for an approaching train, and a failure to so look, if injury results, will not be excused because the train of the railroad company may have been running faster than allowed by a city ordinance, and without the giving of the appropriate and required signals.

From the Vanderburgh Circuit Court.

*A. Iglehart* and *J. E. Iglehart,* for appellant.

*C. Denby, D. B. Kumler,* and *V. Bisch,* for appellee.

DOWNEY, J.—This was an action by the appellee against the appellant. The complaint, in substance, charges, that the defendant, before and at the time of the committing of the grievances hereinafter mentioned, to wit, on the 17th day of January, 1873, was the owner and occupier of a certain railroad leading from Evansville, in the State of Indiana, to St. Louis, in the State of Missouri, and of certain cars and locomotives running thereon; that the said railroad, so operated, etc., ran upon and occupied a certain track belonging to and used by the said defendant, said track being on Third street

The St. Louis, etc., R. W. Co. *v.* Mathias.

in said city of Evansville, below Pigeon Creek. And the plaintiff avers, that on said day he was in the employ of one William Friedrick, and engaged in hauling coal with a team of horses and wagon, then belonging to said Friedrick; that while he was driving said team along Eleventh avenue, in said city, which avenue crosses the railroad track of the defendant at right angles, the plaintiff, together with said horses and wagon, without the fault or negligence of the said plaintiff, were run into by a certain train of cars and locomotive belonging to and operated by the said defendant, her agents, servants, and employes, by reason whereof the plaintiff was violently thrown from his wagon, his right shoulder dislocated, and otherwise severely injured; that the defendant so carelessly, negligently, wantonly, and unlawfully ran and managed said train of cars and locomotive, that the same ran into, over, against, and upon the plaintiff, and thereby violently threw him from the wagon then being driven by him, dislocated his shoulder, and otherwise hurt and injured said plaintiff, by which he has been permanently injured and lamed in his arm, and never will recover from said injury, to his damage five thousand dollars, for which he demands judgment.

The defendant answered by a general denial of each and every allegation of the complaint.

A trial by jury resulted in a verdict for the plaintiff, assessing his damages at twenty-five hundred dollars.

A motion by the defendant for a new trial was overruled, and final judgment was rendered for the amount of the verdict.

The errors assigned bring before us for decision the questions as to the sufficiency of the complaint and the correctness or incorrectness of the ruling of the court in refusing to grant a new trial.

The insufficiency of the complaint is not much relied upon in the brief of counsel. It was presented in the court below by a motion in arrest of judgment. The question is made and

disposed of in the brief of counsel for appellant, in the following language :

"But, finally, the judgment should have been arrested, because of the uncertainty of the allegations in the complaint. It is impossible to tell from the complaint what acts of negligence were relied upon."

The question is decided against the appellant in *The Indianapolis, etc., R. R. Co.* v. *Keeley's Adm'r*, 23 Ind. 133. It was there held, that the general averment, that " the defendant, by her agents and servants, did carelessly and negligently run over," etc., was sufficient, without stating the particular acts constituting such negligence. And see *The Ohio & Miss. R. W. Co.* v. *Selby*, 47 Ind. 471.

The first question, arising under the second assignment of error, to which we will refer, relates to the admission in evidence of an ordinance of the city regulating the running of trains in the city, the speed of the trains, the ringing of the bell of the engine, etc. Counsel for appellant urge this as an error. We do not think it an error. The admissibility of such an ordinance and evidence of its violation, as a circumstance to be considered by the jury in deciding the question of negligence, must be regarded as settled. *The Madison, etc., R. R. Co.* v. *Taffe*, 37 Ind. 361.

Special objection is made to the eighth section of the ordinance, on the ground that it " had not the slightest bearing upon the case." Counsel say, " where immaterial testimony is admitted, the presumption is that it injured the party against whom the error is committed," and in support of the assertion refer to *The Bellefontaine R. W. Co.* v. *Hunter*, 33 Ind. 335. That case states the rule thus : " Where improper evidence, material to the issue, has been admitted, the presumption is that it worked injury," etc. This does not sustain the position of counsel, as the court speaks of material evidence.

The rule as to the admission of immaterial evidence was applied in *Van Vacter* v. *M'Killip*, 7 Blackf. 578, and in *Sparks* v. *Heritage*, 45 Ind. 66. There was no available error in admitting the whole ordinance in evidence.

The St. Louis, etc., R. W. Co. *v.* Mathias.

The bill of exceptions shows that one of the counsel for the plaintiff, in the commencement of his closing argument, made use of this language :

" Gentlemen of the jury, the question for you to determine in this case is, whether or not this railroad company shall be permitted to run their track in the streets, and when the city council requires them by ordinance not to run their trains at a greater speed than five miles an hour, and that they shall ring their bell all the time while running along the streets, and that they shall post at the crossings sign-boards warning passengers of the approach of their trains, whether they shall be permitted to disregard all these requisitions and run their trains from twelve to fifteen miles an hour, in utter disregard of the lives of the people, along the streets, and of all these requisitions made by the city for their protection. Gentlemen, it is for you to determine, by your verdict in this case, whether this country shall be governed by railroad companies or by the people."

It is a matter peculiarly within the province of the court, before which a trial is had, to regulate and control the arguments of counsel. If in any case this court would reverse a judgment for an error in the exercise of its authority in such a matter, it would have to be a very clear case of abuse of such discretion. In this case, there was no objection made, nor any request to the court to correct the statement or to limit counsel to a more pertinent discussion of the questions involved. This irregularity was first urged in the motion for a new trial. No doubt counsel frequently, in the heat of discussion, prompted by a zeal for their clients, waste the time of the court and use language and arguments not pertinent to the question at issue. But, as a general rule, the correction of these matters must be left to the *nisi prius* courts.

We will next consider the case with reference to the sufficiency of the evidence. In order to its proper understanding, we here insert a map of that part of the city where the occurrence took place :

The following is believed to be a full and correct abstract of the evidence, and is taken from the brief of counsel for the appellee :

Evidence on behalf of plaintiff:

Frank Edmonds swore he was a carpenter, building a house fronting on Third street, along which the road of the appellant runs, the day of the collision; he was at work on lot 17, in block 123, a distance of one hundred and twenty feet from the point of collision; he was at work in the front part of the house and saw the locomotive Ajax, with one platform car attached, pass; before that day, the Ajax had passed frequently, and at irregular times; the Ajax was a switch engine; he observed the train opposite the house where he was at work; there was no signal given of the approach of the train either by blowing the whistle or ringing the bell; heard there was a collision, and immediately went to the place; Mathias seemed badly hurt; his lips were bleeding; he could not raise his arm; there was a dislocation, and he could not walk; was carried into the house; it was about two o'clock; the horses were lying on the north side of the street; both were killed by the collision; one had his hind leg cut off; the horses were lying thirty or thirty-five feet from the point of collision, on one side of the track, and the wagon with its wheels smashed on the other; the train ran sixty yards past the point of collision before stopping; it was a cold, stormy day; there were three inches of snow on the ground; the train was running fast, at the rate of twelve miles an hour; there was talk of the speed that day, after the collision; there is but one house on the south side of Third street, between Tenth and Eleventh avenues, and that is on the corner of Third street and Eleventh avenue, on the south-east corner; the speed of the train was extra fast that day; the Ajax passed two, three, and four times a day.

Cross-examined: "Was talking when the engine passed; the doors and windows and the front part of the house were open so I could see; was looking for myself; when the engine first came in sight there was no bell ringing; Andrew Wood called my attention to it at the time; that evening there was general talk among the people about the speed of the train; I can always hear the bell before I can see the train; usually I can hear the noise of the train two squares before I see it."

One Stephens swore he lived on the corner of Third street and Eleventh avenue, but knew nothing of the facts in the case.

John J. Chapman swore he was in the saloon at the corner of Third street and Eleventh avenue on the 17th of January, 1873, the day of the collision; did not see the train previous to collision; the horses were lying thirty-five or forty feet from the point of collision, and the train ran sixty or seventy yards past the point of collision before it was stopped; the horses were dead; plaintiff did not appear rational, and complained of his shoulder, arm, and side; he was within sixty feet of the track, and there was no signal that he heard; it was not snowing at the time, but had been.

Dr. H. T. Legler swore he was a physician and surgeon; had twenty years' experience in his profession; "was called to see appellee at the corner of Third street and Eleventh avenue; went between three and four o'clock; on examination, found there was a dislocation of the left shoulder; some slight bruises and hurts on his person; dressed his wounds and reduced the dislocation, and attended him during January, February, and March; the joint soon became all right and in proper place, but on account of the wounding of certain nerves of the arm by the dislocation, three of his fingers are affected with a sort of paralysis; he has full power in his other finger, but think some portion of paralysis will be permanent; he may be restored in three years, but his shoulder will always be liable to a recurrence of dislocation; his hand and arm are disabled, which prevents the performance of ordinary labor; have attended him for three months now; he has not full power to use his fingers; the nerves near the socket of the shoulder were pushed aside, and one of them stretched; his shoulder joint is still painful; the injury will prevent his working."

Cross-examined: "Predisposition to re-dislocation follows all dislocations; his hand may get well; cannot state positively."

Dr. Fritz, sworn: "Practising physician and surgeon for twenty-two years in the United States; met Dr. Legler going

to see appellee on the 17th of January, 1873; he put the shoulder in place; some contusion besides the dislocation; visited him three times; last examined him three weeks after the injury; the nerves of the arm are partially paralyzed, which, in such cases, often results in permanent injury; this is true, for the reason that Mathias is an old man; he ought to have recovered before this time; there was a great deal of swelling and inflammation on account of dislocation; the whole arm had lost its motion when I saw him the first and second weeks after the injury; paralysis affects the muscles; as soon as the nerve is injured, motion of muscles is lost."

Andrew Wood, sworn: "I am a carpenter, and on the 17th of January, 1873, was at work with Frank Edmonds, near the corner of Third street and Eleventh avenue; the house in which we were working had no shutters to openings; four windows and one door fronting on Third street, along which the St. Louis and South-Eastern Railway Company operates their road; was at work one hundred and twenty feet from the point of collision; saw 'Ajax' with cars going toward coal mines from city just as it was opposite the house where we worked; train was running at the rate of twelve miles an hour; no bell nor whistle that I heard; train ran sixty yards from the point of collision before it stopped; horses were lying about thirty feet from the point of collision; wagon on opposite side of track badly broken; saw Mathias carried into the house; appeared to suffer pain; it was a cold day, and had been snowing."

Cross-examined: Train was going faster than a man could go on a horse; it was twelve miles an hour; did not usually run so fast; spoke of speed of train before the collision as the train went by; can see train three or four squares from point of collision; can't hear it so far; did not hear it that day; generally could hear train three squares, but that time did not hear train till he saw it.

W. R. Gurley, sworn: Was at the blacksmith shop of —— —— on the 17th of January, 1873, on Third street, when the train passed; it was an irregular train; noticed a chunk of

snow on the wheel, and said to Woods, " How is that for four miles an hour?" He said, " they are raising it." No bell was rung, nor whistle sounded; was doing nothing; train passed the door; it was running twelve or fifteen miles an hour; " I mentioned the fact at the time; was within fifty feet of the train when it passed; went to the place of collision; horses were thrown twenty-five or thirty feet from where they were struck; wagon was broken."

Cross-examined: " Said as the train passed, ' How is that for four miles an hour?' Have been brakeman, fireman, and laborer on O. & M. R. R., Kentucky Central R. R., and Chicago and Cincinnati."

George Wund swore his shop was in block 124, on Third street; was at work, when the train passed at full speed; it passed forty feet from the shop; did not hear bell nor whistle; " I went out as the train passed, and said, ' Look how fast she is running.' Was not at the collision; it was a cold day."

Cross-examined: Gurley called his attention to the speed of the train; a snow-ball fell from wheel as train passed; was working, and ran out to look; came to conclusion train was going at twelve miles an hour without consulting anybody.

Fred. Bauer, sworn: " Live on the corner of Third street and Tenth avenue; keep a grocery a distance of sixteen lots of twenty-five feet width, four hundred feet from Eleventh avenue; was at house 17th of January; train passed, locomotive and one car; three or four men on train; heard neither bell nor whistle; ran twelve or fifteen miles an hour; can hear train when bell rings three or four squares, but heard nothing that day; went down to place of collision half hour afterward, but all was over; attention was attracted to the train because it ran so fast, and no bell was ringing."

Cross-examined: " Train ran too fast; they aim to run too fast; ran heap faster than their time; could not hear train run half a square; could not hear the escapement that distance; it made no noise; mentioned day of collision that train ran too fast; Edmonds thought twelve miles an hour;

he thought more; after that day train ran slower; running faster that day than before."

Mrs. Beal swore she was one square from the line of the railroad when the collision happened; she was standing in the front door; saw the engine and one car running faster than usual; saw the train after it passed the hospital; no bell nor whistle, as she heard; saw a man at same time slowly driving across the track, very near train; seemed as if he would stop, and then whipped his horses; saw the train strike the man and throw him on the other side of the street; when the train struck the horses they were thrown into the air about as high as a small cottage house; the man went in the other direction, but not so high as the horses; train ran fifty or sixty yards after striking the team.

Cross-examined: Did not see the man until he seemed whipping his horses; they seemed frightened.

Andrew Grunder swore he was at the Marine Hospital the day of the collision; was at the front window, and saw the collision; train came so fast that a bird could not have passed it; heard no bell; train was coming from the coal mines.

One Ready swore, he went for the doctor at four o'clock, and doctor came at five o'clock.

Christ Mous swore, he lived on the corner of Third street and Eleventh avenue; " saw the train pass, but don't know how fast; am no judge of speed; was in the room fronting the street; did not hear any bell."

Paul Mathias, the appellee, swore his business is gathering soap-grease, selling soap, and hauling coal; on day of collision, 17th of January, 1873, was going, with a load of coal from the mines, to Mr. Friedrick's, his employer; drove two horses and wagon belonging to Friedrick; drove along Second street, until he came to Eleventh avenue, when he turned up Eleventh avenue to cross Third street; the collision occurred about two o'clock P. M.; had driven the road more than fifty times; had driven that team for a long time; is sixty years old, and his eyesight is good; it was a cold day; had on an old jacket, and a handkerchief tied around his chin;

had his head up, driving along; heard nothing, saw nothing, until struck by train; can hear well; looked when near the track, but saw no train; did not see train till he was struck; don't know what happened any more, what became of horses, nor how far he was thrown; was in a house when he became conscious; shoulder was sticking out, leg was bruised, and was laid up for five months; cannot use his hand, and there is no feeling in his forearm; heard no bell nor whistle.

Cross-examined: It was about ten steps from the track when he looked around; was driving in a walk, and had twenty bushels of coal on wagon; nothing round his ears; handkerchief round his neck; was at the factory all the morning, not elsewhere.

William Friedrick swore he was owner of the team appellee drove on day of collision; appellee drove his team and attended to his business; is a good driver; knows when he was hurt; has since been sick; could not work; was laid up for two months; not able to work yet; he still has to help him put on his coat.

Evidence on behalf of defendant:

John Folks swore he had been an engineer for ten years; locomotive engineer for eighteen months; has been in the employ of the St. L. & S. E. R. W. Co. during that time on the engine Ajax, used by the company only for switching purposes between the company's depot and the coal mines half mile below the city; on the day of the collision was going with the engine and two flat cars from the depot to the mines; just before they reached Eleventh avenue, the fireman, who was ringing the bell, called out, "Look out for the wagon." He shut off steam and reversed the engine, and almost immediately the locomotive struck the team; the fireman began to ring the bell when the train started, and continued to ring up to the time of collision; he stood on the left side; it is his business to put in fuel, ring the bell, and keep watch on his side; did not see plaintiff or team until after collision; only ran two lengths of a car after striking the team until the train was stopped; for four squares the track and surface of the

country are level; track is straight; can see locomotive for four squares from Eleventh avenue; it was a very cold day; locomotive makes noise enough to be heard three or four squares; at time fireman gave notice, train was moving at a rate not to exceed four or five miles an hour; was running about the usual speed; there is a small one-story house on the east side of Third street at the intersection of the east line of Eleventh avenue; the one on the south side is the only building on the square; plaintiff had a comfort round his head.

Cross-examined: Horses were taken forty feet from the point of collision; the engine cannot be stopped in less than two hundred feet; can't state positively the distance from the crossing when the engine was reversed; stopped one hundred feet on the other side of the crossing.

Sebastian Kottenbacker swore he had been fireman on the engine Ajax since July, 1872; was on her that day; his business is to fire, ring the bell, and look for signals on the left side; was on the left side that day; were not going faster than usual; when twenty or thirty yards this side of the corner of Third street and Eleventh avenue, said "Look out for team," and in one or two minutes the accident occurred; team was not far off when he first saw it; when he saw the team pass the corner, said, "look out," etc.; engineer immediately shut off steam and reversed the engine; the old man drove right straight along, with a comfort on his ears, and did not turn his head nor hurry or slacken his pace; ground is level; thinks he rang the bell—pretty certain he did—he did ring it on that occasion; "Phillips and Wolf were on the engine at the time, besides engineer and myself."

Cross-examined: It might have been only two or three seconds from the time he said "look out," etc., until he repeated it; "was ringing the bell as we passed the blacksmith shop and Bauer's; train was not running faster than usual, but don't know how fast.".

John Wolf swore he was brakeman on the train; it was a very cold day; was on the left hand side of the engine; it was too cold to be on the cars; near the crossing saw the team

coming up Eleventh avenue; fireman called, "Look out," etc.; engineer shut off steam and reversed; the old man was driving in a slow walk; did not look either way, but straight ahead; when the fireman called out, he could see the team passing from behind a house on the corner of Third street and Eleventh avenue; running on usual time; the Ajax is a very heavy engine; engine struck between the wagon and team; ran forty or fifty feet past team; have a cow-catcher on the engine.

Cross-examined: His place is at the brakes, but it was too cold to stay on the cars that day; heard the fireman call out, and repeat immediately; on the second call, lever was already turned back; it takes a little time to stop a train; the horses lay ten or fifteen feet from the crossing; the old man lay near the wagon, which was badly broken; the reversal of the engine had but little effect; the fireman rang the bell, and was ringing it at the time of the collision.

Syl. Phillips swore he was switchman on the road; was on the engine at the time of the collision—on the left hand side; near the corner of Third street and Eleventh avenue, the fireman called out, and the engineer reversed the engine; struck the horses and threw them to the right; did not see the man at the moment; saw plaintiff and team about twenty feet before the collision, looking straight ahead; his head was bundled up; was going at the rate of four or five miles an hour, and the fireman rang the bell all the way.

Cross-examined: Bell rang from the time they left the yard; team was twenty feet from track when he saw it first; heard the fireman say, "Look out for team," only once; about twenty yards from the crossing, when he heard the fireman say, "Look out for team;" very cold day; rails were frosty, and the train hard to stop.

Dr. J. T. DeBruler sworn: Is a physician and surgeon; examined plaintiff; shoulder is all right; joint perfect; thinks the nervous injury scarcely permanent; all dislocations are, more or less, liable to a recurrence; should say, from examination, that his arm would in course of time become perfect;

sufficient time has not elapsed to restore the limb perfectly; he is an old man, and there is less probability of his fully recovering than if he were young.

Heber M. Harvey sworn: "Am a physician and surgeon; examined the old man yesterday;" dislocation of the shoulder, but thinks him all right now; sufficient time has not elapsed to be fully restored; thinks he will have good use of his arm in a year; thinks restoration will be perfect, except liability to recurrence.

Cross-examined: " He will always be more or less liable to rheumatic pains; dislocation is more liable to produce permanent injury in a man of the plaintiff's age than if he were younger."

George W. Moore swore he lived in that part of Evansville where the collision occurred; Eleventh avenue is eighty feet wide; Third street is sixty feet wide; from the intersection of those streets you can see four and a half squares; the track and grounds are level, and there is but one house in block 141, and that is on the corner of Eleventh avenue and Third street.

Samuel Patterson swore he was an engineer; has been for twelve years; is now doing yard switching for the E. & C. R. R.; he knows the engine Ajax; she is a thirty-six ton engine; a reversal of the engine would stop her in five yards, if she was not running over six miles an hour; if the weather is frosty, the rails are slippery, and the brakes will not take effect so easily; mere freezing of the ground will not frost the rails, but when they are frosted and there is snow on them, the brakes will not take effect so readily; Folks is a competent engineer; a train running ten or twelve miles an hour in the city would be dangerous; the brakes, as well as reversing the engine, should be applied in stopping the train; the engine ought to be stopped in a hundred and fifty feet.

The city ordinance, given in evidence, prohibited a greater rate of speed than five miles an hour. It required the bell of each locomotive engine to be rung continuously while running in the city. It contained many other regulations, which have

no material bearing on the questions involved in the case. It required superintendents of railroads to furnish each engineer and train conductor of any railroad running in the city with a copy of the ordinance.

In deciding upon the sufficiency of the evidence, we are not required or permitted to weigh the testimony of the witnesses on each side, with a view to determine which side has the preponderance. This the jury has a right to do, and we must presume did do in arriving at a verdict. The rules as to negligence on the part of the defendant, and contributory negligence on the part of the plaintiff, are now so well settled, and ought to be so well understood, that we do not deem it necessary or proper to incorporate them in this opinion. The first inquiry is, was there negligence on the part of the defendant? The second is, was there contributory negligence on the part of the plaintiff? If the evidence justified an affirmative answer to the first and a negative answer to the second question, then the verdict was right. But if it did not justify an affirmative answer to the first inquiry, or did not justify a negative answer to the second, the verdict should have been set aside, and a new trial granted. It is not enough that there should have been negligence on the part of the defendant, but there must have been the absence of contributory negligence on the part of the plaintiff.

The evidence of the plaintiff, considered without any reference to the evidence of the defendant, and in this way we may consider it, although the jury could not do so, clearly shows that the train was running with twice or more than twice the rapidity allowed by the city ordinance, and that the bell was not being rung, the whistle sounded, or any other signal of approach given. The defendant's evidence shows that there were four men on the train, and that they were all on the engine. Wolf says it was too cold to be on the cars. The only means of checking or stopping the train, which were used, were such as could be commanded and used by the engineer. When it is too cold to allow the hands on a train to be at their proper places, and to exercise their appropriate and appointed

duties, trains should not be run. Human life cannot be made to depend upon the mere comfort of those in charge of trains. It is very clear, we think, without referring to any other circumstances disclosed by the evidence, that the agents and servants of the defendant were guilty of negligence in running the train. This question could not be decided otherwise, if its decision depended on the evidence introduced by the defendant alone.

The next question is, was there contributory negligence on the part of the plaintiff? He was aware of the existence of the railroad, and that it was in use, for he says he had driven the road more than fifty times. He came from the coal mines along Second street, one square from the railroad, to Eleventh avenue; when he reached that avenue, he made a right angle and went north to the place of the collision at Third street. He could see and hear well. In his direct examination, he stated that he looked when near the track, but saw no train. In his cross-examination, he says it was about ten steps from the track when he looked around; his team was travelling in a walk; he had his head up; heard nothing and saw nothing of the train until he was struck. For four squares east on Third street, the direction from which the train was coming, the surface was level, and the track straight, and for that distance the train could ordinarily be heard. There were three inches of snow on the ground, which we may suppose would prevent a part of the noise usually made by the running of the train. But while this is true, it seems to us that the existence of the snow, making the surface of the ground white, would serve to render the approaching train more plainly visible. Mrs. Beal, one of the plaintiff's witnesses, stated that she saw the train, and saw a man at the same time slowly driving across the track, very near the train; he seemed as if he would stop, and then whipped his horses. When the plaintiff looked, if he was ten steps from the railroad track, and we suppose the train was running ten times as fast as the team was going, it could have been only one hundred steps from the place

of the collision at that time, and the inference is irresistible that the train might have been, and must have been, seen by the plaintiff, if he had looked in the direction from which the train was coming. There is no estimate of the speed of the team and of the train which can fairly be made, consistent with the evidence, which would place the approaching train so far from the place of the collision that it might not readily and easily have been seen by the plaintiff at any time after he emerged from behind the house on the south-east corner of the crossing streets, as shown by the plat. There is no evidence that the plaintiff looked in the direction of the approaching train. In the plaintiff's direct examination, he says he "looked when near," and in his cross-examination, he says he "looked round." But in what direction he looked does not appear. The evidence on the part of the plaintiff, without considering that of the defendant, fails to make out this part of the plaintiff's case. The evidence of the defendant makes the case much stronger against the plaintiff. Kottenbacker says, "the old man drove right straight along, with a comfort on his ears, and did not turn his head nor hurry or slacken his pace." Wolf says, the plaintiff "did not look either way, but straight ahead."

The case is not one of conflict of evidence, for there is no evidence on behalf of the plaintiff that he looked in the direction of the approaching train. This we think he was bound to do, whether the train of the defendant was running faster than allowed by the ordinance, or giving the appropriate and required signals, or not. The mere negligence of the defendant cannot excuse the contributory negligence of the plaintiff.

Without going into an examination of authorities on this point, we refer to the case of The Bellefontaine R. W. Co. v. Hunter, 33 Ind. 335, and the cases cited in the opinion.

The judgment is reversed, with costs, and the cause remanded for a new trial.

BUSKIRK, C. J.—I cannot concur in the judgment rendered in

this case. The ruling is placed upon the ground that the evidence does not show that the plaintiff looked in both directions before attempting to cross the track of the railroad. That was a question which ought to have been, and doubtless was, fully considered by the jury in rendering their verdict, and the court in passing upon the motion for a new trial. The question having been duly considered by those who had far greater opportunities of knowing the truth than we have, we should indulge a strong presumption in favor of the action of the jury and court below.

By the opinion of the court, the presumption is against the action of the jury and court below. The plaintiff testified that he looked and listened, and saw nothing and heard nothing of an approaching train. Viewing the evidence as it is put on paper, and indulging the proper presumption in favor of the action of the lower court, we should presume that the plaintiff looked in both directions.

But conceding that the plaintiff was guilty of slight negligence, I am of the opinion that he is entitled to recover upon two grounds:

First. In my opinion, the negligence of the employes of the railroad company was so great and gross as to imply a disregard of consequences, and a willingness to inflict the injury. When such is the case the plaintiff may recover, though he is a trespasser, or did not use ordinary care to avoid the injury. *Wright* v. *Brown*, 4 Ind. 95; *The Evansville, etc., R. R. Co.* v. *Lowdermilk*; 15 Ind. 120; *The Lafayette, etc., R. R. Co.* v. *Adams*, 26 Ind. 76. See the numerous cases cited in the notes to section 37, pp. 45 and 46 Shearman & Redfield on Negligence.

Second. The train which inflicted the injury was run through the streets of a populous city at the rate of twelve miles an hour, when the track was frosty, which rendered it more difficult to control the train. The brakemen, instead of being at their places, where they could have materially aided in stopping the train, were upon the engine. If it was too cold for the brakemen to be at their places, it was too cold to run the train. The bell was not rung, nor was the whistle sounded.

Those in charge of the train, in open violation of the ordinance of the city regulating the speed of trains and ringing of the bells thereon, and in utter disregard of consequences and the security of human life, rushed upon the plaintiff, and by their whole conduct evinced a willingness to inflict the injury complained of. I cannot, by concurring in the judgment, give my sanction to such reckless disregard of human life.

It is now well settled, both in England and in this country, that the plaintiff may recover, notwithstanding his own negligence exposed him to the risk of injury, if the defendant, after becoming aware of the plaintiff's danger, failed to use ordinary care to avoid injuring him; for in such case the failure to use such diligence is held to be alone the proximate and immediate cause of such injury. See section 36, and the cases cited in support of the doctrine there stated in the notes to such section, of Shearman & Redfield on Negligence, pp. 43 and 44.

The following cases in this court support the doctrine above stated: *The Evansville, etc., R. R. Co.* v. *Hiatt*, 17 Ind. 102; *Thayer* v. *The St. Louis, etc., R. R. Co.*, 22 Ind. 26; *The Indianapolis, etc., R. R. Co.* v. *Wright*, 22 Ind. 376; *The Indianapolis, etc., R. R. Co.* v. *Keeley's Adm'r*, 23 Ind. 133.

Those in charge of the train swear that they saw the plaintiff, his wagon and team, when he turned the corner of the house on Eleventh avenue, when the train was about three hundred feet from the place of accident, and that the engineer shut off steam and reversed the engine. It was fully shown by the evidence that the shutting off of steam and reversing the engine had very slight effect upon the train, and tended in a very slight degree, if at all, to lessen the danger of the plaintiff. If the engineer had sounded a sharp and shrill whistle, it would have reached the plaintiff, and would have induced him to stop before he reached the track of the railroad. But there is no pretence that this was done. This is the most usual and effective way of giving notice of danger, but it was not resorted to, which is another striking, and, to my

The Board, etc., Tippecanoe Co. *et al. v.* The Lafayette, etc., R. R. Co. *et al*

mind, conclusive, evidence of the reckless and inhuman conduct of those in charge of the train.

The sanctity of human life, and a regard for the property of the citizen and the rights of the public, imperatively require that railroad companies should be taught a lesson which will induce them to employ more prudent, humane, and law-abiding persons than those in charge of the train in question, to operate and control the trains upon their roads.

In my opinion, the judgment of the court below should be in all things affirmed.

Opinions filed November term, 1874; petition for a rehearing overruled May term, 1875.

