No. 17,399.

ENGRER v. OHIO AND MISSISSIPPI RAILWAY CO.

APPELLATE PROCEDURE.—*Correct Result Reached.—Practice.—Trial.*
—The withdrawal of a case from the jury, and rendering judgment for defendant, without any finding of either court or jury, instead of directing the jury to return a verdict for defendant, although error, is not cause for reversal where the correct result is reached.

RAILROAD.—*Highway Crossing.—Contributory Negligence.--Damages.*
One who drives at a trot towards a railway crossing, without looking until his horse's head runs against a passenger coach, which he might have seen before reaching the track if he had looked, is guilty of such contributory negligence as will prevent a recovery.

From the Clarke Circuit Court.

*Voigt & Stotsenburg*, for appellant.

*J. Harmon, E. W. Strong, C. L. Jewett* and *H. E. Jewett*, for appellee.

McCABE, J.—The appellant sued the appellee in the Clarke Circuit Court, to recover damages sustained by him for a personal injury and injury to his horse and wagon, alleged to have been sustained by him through the alleged negligence of the appellee.

After the appellant had introduced his evidence and rested his cause, and without the introduction of any evidence for the defense, on motion of the appellee, the court withdrew the cause from the jury over the appellant's objection and exception and entered judgment in favor of the appellee that the plaintiff take nothing by his suit, and that the appellee recover judgment for costs over appellant's motion for a new trial.

Error is assigned on the action of the trial court in withdrawing the case from the jury, overruling appellant's motion for new trial and entering judgment for the appellee on the evidence. The substance of the evidence, as to appellant's freedom from negligence, is that on April 18, 1889, the appellant was driving a horse attached to a covered spring wagon down a long hill over a hard turnpike road in Clarke county. At the foot of the hill the turnpike crosses the main track of the appellee's railway. The appellant drove his horse in a trot against one of the passenger trains which was running over the crossing at a speed of about thirty miles an hour. The horse's head struck the side of the first or second passenger coach in the train. The horse was necessarily injured, the wagon was overturned and the occupants thrown out some distance, including the appellant, inflicting some personal injury.

It is down grade on the pike all the way to the track. The pike was hard and smooth and in very good condition. The pike runs in a southerly direction and so does the railroad track. The appellant was traveling in a southerly direction. The train was also coming in a southerly direction. Before starting down the hill, a train can be seen on the railroad coming south a long distance, probably a half mile or three quarters. "The hill is from 130 to 150 feet long. When within fifty feet of the track a train coming from the north could possibly be seen 100 yards north of the crossing. The nearer the track you approach the further up the track you can see. The crossing is on a down grade coming towards Jeffersonville. When within twenty feet of the crossing you can see a train coming from the north three or four miles. When you get within fifty or sixty feet of the crossing, you can see a train coming from the north possibly fifty yards away, and in twenty feet of the crossing you can see a train to the north three or four miles. If one in a wagon stopped within twenty feet of the crossing and would look to the north toward Charlestown he could see a train approaching from that direction for more than a mile." And that was the condition of affairs there when the collision occurred. The appellant was well acquainted there and had frequently passed there before. When appellant got half way down from the top of the hill, by looking to his right he could have seen the approaching train; that is, he could have seen the smoke stack of the locomotive. He could have seen the approaching train for a distance of seventy-five yards of the way down the hill. He just came right along there in a trot without stopping until he came in collision with the cars. He was in a covered wagon with side curtains which were up. There was a

colored boy with him in the wagon who sat on the seat to appellant's left. Engrer was sitting on the right next to the railroad and he was driving the horse. Nolan "hollered" at him when he was about half way down the hill from the top to the crossing. Throwed up his hand and "hollered" once or twice. He "hollered" "ha!" and threw up his hands to attract his attention. He was in view if Engrer had been looking toward him. He was to Engrer's left as he came south down the road. Witness heard the whistle while in his front door. Saw Engrer a short time after he heard the whistle not more than a minute. The colored boy in the wagon testified that they were trotting along very slowly. "We were looking ahead of us. The front part of the first car struck the horse's head first; then the horse jumped around sideways and threw the wagon right up against the edge of the car; I fell out over the side of the wagon and Engrer fell out there."

Engrer testified in substance: I was on my way back, the curtains were rolled up; could see out either side; horse went a slow trot. I was looking in front of me because I knew the crossing was in front of me. Was looking there to see if any train was coming, when I didn't, honestly, see or hear anything until I see my horse tumble over and then the wagon broke down and I fell down with it. I had hold of the line of the horse when he got up. The side of the train struck my horse.

" Quest. Which way were you looking just before and at the time the train struck you? Ans. Right ahead of me at the horse. I always look at the horse when I travel.

"Quest. Did you or did you not hear any whistle? Ans. I did really not hear any or I should have stopped, for I am careful. I never did want to get

hurt. Did not hear any bell. I never tried to beat a train, never did. I drove past there before. I didn't know the depth of the cut. I have been there, passed there often, but not about train time.

"Quest. When you commenced going down hill, how long did you keep looking for it (the train)? Ans. I looked straight ahead; I know I am compelled to see it if she comes around the cut.

"Quest. Now you say you commenced looking for the train when you got to the top of the hill? Ans. Yes, sir.

"Quest. How long did you keep that up? Ans. Kept it up until I see my horse tumble and then me right after it. Looked straight ahead. Could see ahead of me a good ways, but couldn't see back of me. Could see a good distance up the road. I was looking on the right side where she is to come— I was looking toward the right side. I had the line in this hand, and sat right in that position with my hand on this knee, and looking like this way (indicating)." The court: "Looking down the pike to the crossing?" "No, I was looking more to the right. I was looking to the right; I knowed she comes from the right. I was listening. I looked so if the train would come out there I would see it quick enough to turn my horse to get out of the way. There is no distance at all to turn, there is plenty of room there on the left, the pike is there, and before I knowed anything, out she shot, and down went my horse, and me after it, and that is the last I remember."

On cross-examination, he testified in substance as follows: "Went in a slow trot down the hill, didn't see the train until the side of the passenger car struck my horse.

"Quest. The cut there is so you couldn't see the train until it got nearly out? Ans. No, sir; I couldn't.

"Quest. You were looking at the end of the cut to see

when it came out?  Ans.  Oh, yes, I was watching for it close.  I have frequently passed there, and I always watch."

The duty and obligation of appellant was fixed by law, and may be summarized as follows:

1.  The presence of the railroad which he was about to cross was notice to him of danger.

2.  It was his duty to exercise ordinary care and caution in approaching the crossing to avoid injury to himself.

3.  It was his bounden duty to listen for approaching trains.

4.  It was his duty to look both ways for approaching trains, a sufficient length of time before venturing upon the crossing, to enable him to avoid a collision, if the surroundings are such as to enable him to see an approaching train.

5.  If the surroundings were not such as to admit of his seeing both ways until he arrived at a point near the crossing, it was his duty when reaching such point to look both ways for approaching trains.

6.  Without regard to the question of the appellee's negligence, the appellant must affirmatively show that he did not contribute to his own injury by neglecting to observe and perform some one, or more of the above enumerated duties, or he cannot recover.

7.  His injuries were *prima facie* the result of his own negligence; that is to say, where one person is injured by a collision with a train of cars, it is *prima facie* the result of his own negligence.  And before he can recover, though the railroad company be ever so negligent, he must affirmatively establish that his own negligent failure to perform his duty, did not contribute to bring about his own injury.  *Hathaway* v. *Toledo, etc., R. W. Co.*, 46 Ind. 25; *Bellefontaine R. W. Co.*

v. *Hunter*, 33 Ind. 335 ; *St. Louis, etc., R. W. Co.* v. *Mathias*, 50 Ind. 65 ; *Terre Haute, etc., R. R. Co.* v. *Clark, Admr.*, 73 Ind. 168 ; *Cincinnati, etc., R. R. Co.* v. *Butler*, 103 Ind. 31 ; *Indiana, etc., R. W. Co.* v. *Greene, Admx.*, 106 Ind. 279 ; *Connor* v. *Citizens' St. R. W. Co.*, 105 Ind. 62 ; *Mann* v *Belt R. R., etc., Co.*, 128 Ind. 138 ; *Louisville, etc., R. W. Co.* v. *Schmidt*, 134 Ind. 16 ; *Cincinnati, etc., R. W. Co.* v. *Grames*, 136 Ind. 39 ; *Lake Erie, etc., R. W. Co.* v. *Stick*, 41 N. E. Rep. 365 ; *Smith* v. *Wabash R. W. Co.*, 141 Ind. 92.

The appellant's evidence fails to establish several of the duties incumbent on the plaintiff, which failure it appears clearly contributed to the production of his injuries.

True, he says, he watched for the train closely, and yet he says that he never saw it until his horse's head ran against the side of the passenger car on the crossing. He gives no reason why he failed to see it sooner. He says he looked to the right, but he does not say he looked to the north, the direction from whence the train was approaching. Indeed his own testimony, as well as that of his other witnesses, affirmatively shows that he wholly failed and neglected to look to the north. And it appears from the testimony of his other witnesses that he could have seen the approaching train by looking in that direction for at least half of the way down the hill, or for a distance of seventy-five yards. And it further appears that when within fifty feet of the crossing he could have seen the approaching train fifty yards away from the crossing, and when within twenty feet of the crossing he could have seen a train in that direction on the track anywhere within three or four miles of the crossing if he had looked to the north. And yet he shows that he drove along in a trot, and never looked in that direction. It is

very evident that he never thought of the train until his horse's head ran against the side of one of the passenger coaches. His whole conduct shows a remarkable case of gross negligence on his part directly contributing to his injury. No matter how negligent the appellee may have been, he must affirmatively prove that his negligence did not contribute to his injury. But he affirmatively proves the direct contrary. He thus shows that he had no cause of action against appellee.

But it was error to withdraw the case from the jury and render judgment for the defendant without any finding of either court or jury. *City of Plymouth* v. *Milner*, 117 Ind. 324. If the appellee thought the plaintiff's evidence made no case against it, the proper remedy was to ask the court to direct the jury to return a verdict for the defendant. And that is what the court ought to have done in this case, and then rendered judgment on that verdict for the defendant. Issues of law are tried by the court and issues of fact are tried by the jury or by the court sitting as the trier of the issues of fact. The trial of the issues of fact is for the purpose of ascertaining what the facts in issue are. Until that is done no judgment of the law can be pronounced regularly, because the facts are as yet unknown.

But, as we have seen, the correct result was reached, though irregularly and by an erroneous procedure.

The statute requires us, in every stage of the case, to disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party, and the statute forbids the reversal of a judgment for such error or defect. R. S. 1894, section 401, (R. S. 1881, section 398).

And it is further provided that no judgment shall be reversed for any defect in form, variance, or imperfections contained in the record, pleadings, etc.,

or other proceedings therein, which by law might be amended in the court below, but such defects shall be deemed to be amended in the supreme court; nor shall any judgment be reversed, in whole or in part, where it shall appear to the court that the merits of the cause have been fairly tried and determined in the court below. R. S. 1894, section 670 (R. S. 1881, section 658).

The correct result having been reached by the trial court without injuriously affecting the substantial rights of the appellant, and the merits of the cause having been fairly tried and determined therein, the statutory provisions referred to require us to affirm the judgment.

Judgment affirmed.

Filed November 26, 1895.